In The United States District Court
For The District of Delaware

Christian DeJesus,

      Petitioner,

      V.

Thomas Carroll, Warden,
Delaware Correctional
Center And Carl C. Danberg,
Attorney General of The
State Delaware,

      Respondents.

Civil Action No. _____

Memorandum Brief

Memorandum Brief In Support of Habeas Petition

      This is Petitioner's Memorandum brief filed in Support of his habeas petition, pursuant to 28 U.S.C. subsec. 2254, and Subsec. 2243 (2000).

      1). That the Petitioner's Confinement violates the Constitution, laws and treaties of the United States; and that the violations rise to the level of a fundamental defect which inherently resulted in a complete Miscarriage of justice, inconsistent with fair Procedure of State law which is of Constitutional magnitude.

2). That the general improprieties which occurred in petitioner's case, in the State proceedings, resulted in fundamental unfairness and consequently violated the petitioner's Fourteenth Amendment Right to due process, to the Constitution of the United States.

## In Support of Ground One of Habeas Petition

3. That the Six Amendment requires that defendants have assistance of Counsel during Certain postindictment identification procedures. In defendant's case the alleged victim recanted her statement made to police by writing Certified letter, prior to trial, averring in a clean and positive manner that she had made a mistake of identity. That the defendant was not the person who committed the Crime against her person. In U.S. v. Wade, 388 U.S. 218, 224 (1967). It is held that the due process Clause of the Fifth Amendment prohibits identification testimony that derives from impermissibly suggestive procedures that may lead to an irreparably mistaken identification. See Stovall V. Denno, 388 U.S. 293, 302 (1967) A defendant must rely upon due process principles to Challenge unnecessarily suggestive procedures that occur at noncritical stages. In Stovall V. Denno, the Supreme Court recognized a defendant's due process to exclude identification that results from unnecessarily suggestive procedures that may lead to an irreparably mistaken identification. 388 U.S. 293, 302 (1967). In petitioner's case due

<u>In Support of Ground Two of Habeas Petition And Three</u>

It is held that the Fifth Amendment guarantees a defendant the right to be tried for only those offenses presented in an indictment returned by the grand jury, that substantive amendments to indictments are reversible error. See <u>Stirone V. U.S</u>, 361 U.S. 212, 217-219 (1960) (amendment of indictment violates Fifth Amendment grand jury clause); See <u>U.S. v. Rosario-Diaz</u>, 202 F.3d 54, 70-71 (1st Cir. 2000)(Constructive amendment of indictment violation of grand jury clause when Court permits jury to convict on evidence not included in the indictment); <u>U.S. v. Dhinsa</u>, 243 F.3d 635, 669 (2d Cir. 2001)(Constructive amendment to indictment is per se invalid); See <u>U.S. v. Randall</u>, 171 F.3d 195, 203 (4th Cir. 1999)(Constructive amendment is per se reversible error and must be corrected on appeal even when defendant did not preserve issue by objection); <u>U.S. v. Nunez</u>, 180 F.3d 227, 231 (5th Cir. 1999)(Constructive amendment per se reversible error when defendant convicted of crime separate from crimes alleged in indictment); <u>U.S. v. Prince</u>, 214 F.3d 740, 757 (6th Cir. 2000)(Constructive amendment of indictment per se prejudicial and warrants reversible); <u>U.S. v. Figee</u>, 197 F.3d 879, 887 (7th Cir. 1999)(Constructive amendment is per se reversible error when Court's instructions broaden possible bases for conviction). Petitioner's Court appointed Counsel was ineffective when he failed to file Severance Motion prior to trial, against joinder of offenses to indictment after the petitioner had already been indicted and on bail for (6)

weeks. The petitioner was rearrested and given an additional ($30,000) bail on two new offenses unrelated and separate from the initial crime. In violation, Delaware and Federal Rules of Criminal Procedures 8(a) and 14. Therefore, amendment of joinder of offense to indictment was prejudicial to the petitioner and violated petitioner's right to due process. (U.S.C.A. Const. Amend. 14)

## Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to effective assistance of Counsel. The right to effective assistance of Counsel applies to both retained and appointed Counsel. See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980); McMan v. Richardson, 397 U.S. 759, 771 n. 14 (1970). The United States Supreme Court established a two-prong test to evaluate ineffective assistance of Counsel Claims. 1) That Counsel's performance fell below an objective standard of reasonableness; and 2) That Counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceedings, Strickland v. Washington, 466 U.S. 668, 687 (1984). In Strickland the Court stated that the purpose of the effective assistance guarantee of the Six Amendment is ... to ensure that Criminal defendant's receive a fair trial." Id at 689. Strickland states that a Court must:

> "judge the reasonableness of Counsel's Challenged conduct on the facts of the particular Case, viewed as of the time of Counsel's Conduct. A convicted defendant making a Claim of ineffective assistance must identify the acts or ommissions of Counsel that are alleged not to have been the result of reasonable professional judgment."

A.( Counsel's failure to cross-examine prosecution witness (Grace Almodovar) amounted to prejudice because witness's unimpeached statements and testimony was direct evidence connecting defendant to crime ) See Dixon V. Snyder, 266 F.3d 693, 704 (7th Cir. 2001). See also trial transcript pages 28-34 attached hereto as exhibit-F)

B). (Prejudice presumed where alleged ineffective assistance of counsel based upon "unexcused failure to file direct appeal from criminal conviction upon the defendant's direction to do so") See e.g. Hernandez V. U.S, 202 F.3d 486, 489 (2d Cir. 2000); Strickland V. Washington, 466 U.S. 668, 692 (1984)(Please See attached exhibit-G, pages 9-12) See Flores-Ortega, 528 U.S. at 484; See also Solis V. U.S.252 F.3d 289, 295 (3rd Cir. 2001)(If Counsel did not honor defendant's request for appeal, then 6th Amendment right to Counsel Violated).

C). (Joinder of offenses of same or similar character is more likely prejudicial because proof of 1 crime may corroborate commission of other crimes); See U.S. V. Holland, 10 F.3d 696, 699 (10th Cir. 1993).

In The United States District Court
For The District of Delaware

Christian De Jesus,                    Civil Action No. _____

     Petitioner,

V

Thomas Carroll, Warden,
Delaware Correctional
Center And Carl C. Danberg,
Attorney General of The
State of Delaware,

     Respondents.

Exhibits

Dated: 9-4-06

          Petitioner, Pro Se,

          Christian De Jesus, # 501798
          1181 Paddock Road
          Smyrna, Delaware 19977.

Legal mail

UNITED STATES PO

02 14
0004608
MAILED FI

I.M. Cristian DeJesus
SBI# 501792 UNIT w1
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

Clerk of the Court
United States District
Court for the District
of Delaware 844 N. King St
lock box 18   Wilmington, DE
19

U.S.M.S
X-RAY

legal mail



Legal mail

UNITED STATES POSTAGE
$ 05.60°
SEP 05 2006
PITNEY BOWES
02 1A
0004608975
MAILED FROM ZIP CODE 19977

Clerk of the court
United States District
Court for the District
of Delaware 844 N King St
Lockbox 18 Wilmington, Delaware
19801

U.S.M.S
X-RAY

Legal mail

**ORIGINAL**

06 · 553

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR <u>NEW CASTLE</u> COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| v. | ) | No. _____ |
| | ) | (to be supplied by Prothonotary) |
| <u>CHRISTIAN DEJESUS</u> | ) | |
| Name of Movant on Indictment | ) | |
| | ) | |
| <u>SAME</u> | ) | |
| Correct Full Name of Movant | ) | |

## MOTION FOR POSTCONVICTION RELIEF



06  553

**FILED**

SEP 0 6 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Scanned

*Exhibit - A*

## MOTION

1.  County in which you were convicted ___New Castle___

2.  Judge who imposed sentence ___Hon. John E. Babiarz Jr.___

3.  Date sentence was imposed ___May 14, 2004___

4.  Offense(s) for which you were sentenced and length of sentence (s): 1 cr
    ___4 counts of P.F.D.C.F. 1 count Burglary,___
    ___3 counts aggravated menacing and 1 count unlawful___
    ___imprisonment 1st - sentenced to 12 years___

5.  Do you have any sentence(s) to serve other than the sentence(s) imposed because of the judgment(s) under attack in this motion?   Yes (  )   No ( ✓ )
    If your answer is "yes," give the following information:
    Name and location of court(s) which imposed the other sentence(s):

    _____

    _____

    Date sentence(s) imposed: ___May 14, 2004___

    Length of sentence(s) ___12 years level V___

6.  What was the basis for the judgment(s) of conviction?   (Check one)
    Plea of guilty (  )
    Plea of guilty without admission of guilt ("Robinson plea")  (  )
    Plea of nolo contendere  (  )
    Verdict of jury  ( ✓ )
    Finding of judge (non-jury trial)  (  )

7.  Judge who accepted plea or presided at trial ___Hon. Babiarz___

8.  Did you take the witness stand and testify?   (Check one)
    No trial (  )   Yes ( ✓ )   No (  )

9.  Did you appeal from the judgment of conviction?  Yes ( ✓ )   No (  )
    If your answer is "yes," give the following information:

    Case number of appeal ___213, 2004___

    Date of court's final order or opinion ___January 10, 2005___

1

10. Other than a direct appeal from the judgment(s) of conviction, have you filed any other motion(s) or petition(s) seeking relief from the judgment(s) in state or federal court? Yes ( ) No (✓)  How many? ( )
If your answer is "yes," give the following information as to each:

Nature of proceeding(s) __N/A__

Grounds raised _____

_____

_____

_____

Was there an evidentiary hearing? __N O__

Case number of proceeding(s) __N/A__

Date(s) of court's final order(s) or opinion(s) __N/A__

Did you appeal the result(s)? __N/A__

11. Give the name of each attorney who represented you at the following stages of the proceedings relating to the judgment(s) under attack in this motion:

At plea of guilty or trial __Ralph D. Wilkinson__

On appeal __Ralph D. Wilkinson__

In any postconviction proceeding __N/A__

12. State every ground on which you claim that your rights were violated. If you fail to set forth all grounds in this motion, you may be barred from raising additional grounds at a later date. You must state facts in support of the ground(s) which you claim. For your information, the following is a list of frequently raised grounds for relief (you may also raise grounds that are not listed here): double jeopardy; illegal detention, arrest, or search and seizure; coerced confession or guilty plea; uninformed waiver of the right to counsel, to remain silent, or to speedy trial; denial of the right to confront witnesses, to subpoena witnesses, to testify, or to effective assistance of counsel; suppression of favorable evidence; unfulfilled plea agreement.

2

Ground one: Defective Indictment

Supporting facts (state the facts briefly without citing cases):

Two indictments joined together 9 charges under March Indictment with 2 charges under April Indictment: two Indictments in one

Ground two: Violation of Rule 8

Supporting facts (state the facts briefly without citing cases):

Unconstitutionality of interwining Indictments

Ground three: Ineffective Assistance of Counsel Allegations

Supporting facts (state the facts briefly without citing cases):

SEE Post-Conviction Motion Rule 61 for remaining claims

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: None of the grounds were raised because of ineffective assistance of counsel. Trial counsel was ineffective from the outset right up to and including the appellate process

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____

Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

_____
Date Signed

_____
Signature of Movant
(Notarization not required)

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| CHRISTIAN DEJESUS | CASE ID# SUPERIOR COURT 0303004601 |
| Defendant-Movant, | CRIM. ACT. NOS. IN0303089 |
| | IN0303 1090 |
| -V- | IN0303 1091 |
| | IN0303-1092 |
| STATE OF DELAWARE. | IN0303-1093 |
| | IN0303 1094 |
| | IN0303 1095 |
| | IN0304 0614 |
| | IN0304 0615 |

MEMORANDUM OF LAW PURSUANT TO SUPERIOR COURT CRIMINAL RULE 61(b) (2) MOTION FOR POST-CONVICTION RELIEF

COMES NOW the defendant, Christian Dejesus who moves this Honorable Court pursuant to Superior Court Criminal Rule 61 based on the statutory violations, the constitutional violations and ineffective assistance of counsel as stated in the attached motion for post-conviction relief.

This is the defendant's memorandum of law to support, his request for relief this _____ day of July 2005

CASE HISTORY AND PROCEDURAL ISSUES

Defendant was arrested on March 7, 2003 for seven criminal offenses with two additional offenses coming later. Trial commenced on May 13 thru 14, 2004, defendant was found guilty on May 14, 2004 and sentenced immediately thereafter to twelve years at level 5. A timely Appeal was taken and denied. This is the defendant's motion for Post-Conviction Relief.

## GROUND ONE A

## POLICE MISCONDUCT

1) Defendant states that the arresting officer Detective Winfreda Campos denied him due process of law to fundamental fairness under the 14th amendment. Upon investigating this case it was revealed to officer Campos on February 14,2003 that there were two suspects in the vehicle that arrived at 116 N. Scott Street, and the passenger whom was the defendants brother the defendant was driving, exited the vehicle and in an attempt to locate the boyfriend of Soliman Torrez, to collect a debt owed to him; committed the offenses for which the defendant stands convicted. Officer Campos withheld this exculpatory evidence from the affidavit of probable cause. Franks v State, Del.Supr. 398 A.2d 783, 786

Officer Campos intentionally and deliberately filed false affidavit of probable cause at the Magistrate Court.

Campos misconduct continued when he began threatening and coercin the alleged victims; when they refused to testify against the defendants brother because they were afraid of him; and in realizing that officer Campos was only interested in arresting the defendant because he believed he was dealing drugs; causing Campos to develope and inherent bias towards the defendant. The victims feared reprisal from the defendants brother who had just put a gun to their heads thereby causing them to refuse to testify against him; despite threats of being locked up by Campos.

Detective Campos kept his promise and locked Malesol, and her daughter Soliman up when they refused to testify as to the guilty party, and refused to testify against the defendant as officer Campos wanted them to because he did not commit the crimes he stood accused of, as was written in the affidavits filed by Campos.

1

threats and being locked up
Maleso Ayala and Soliman Tennet in agreement with
each other to avoid further threats, intimidation and coercive
behavior as well as being put in prison, agreed to testify
against the wrong person because that was what officer
Campos wanted them to do due to his hatred or Christian
zealous for defendant. Detective Campos was not interested
in the truth.

Maleso Ayala had a previous extra-marital affair with
the defendant only months prior to this incident.

The younger victim Grace Almodotra however stuck
to her original testimony that the defendant was not the
person who put a gun to her head. she knew the defend-
ant from his relationship with her mom. she also testified
that the suspect was dark-skinned. she was referring to
the defendant's brother. She was able to testify truthfully
because she was to young (6) for Campos to lock her up.

Defendant claims that the with-holding of evidence
that two people were in the car on February 14, 2003
and coercing victims to testify falsely by arresting officer
deprived the defendant of fundamental fairness 14th.

Defendant claims that the behavior of officer Campos was
such as to overbear the will of Campos to resist and bring
about a statement not "the product of a rational intellect
and free will" without regard to the truthfulness or the
reliability of the statement, and should not have been admi-
ssible under 11 § 3507. If not for the misconduct of Campos
the defendant would have never had to stand trial for these
false allegations and perjured testimony.

Defendant requests that his conviction be thrown out
or as an alternative he be given an evidentiary hearing
to give Maleso and Soliman the free will to tell the
truth. (SEE Hubbard v State. 782 A.2d 264 (2001
    Martin v State. Del.Supr. 433 A.2d 1025

# GROUND NO. 2

## PROSECUTOR MISCONDUCT

1).    Defendant claims that he was denied his due process rights under the 5th and 14th amendments by the prosecutor misconduct. U.S.v.Martino 825 F.2d 754 (3rd Cir.)

Defendant states that the prosecutor Natalie S. Woloshin illegally added two additional charges against him by adding the charges of P.F.D.C.F and unlawful imprisonment in the first degree. The defendant was arrested on March 7, 2003 and charged with seven criminal offenses: by Detective Campos. He was charged with three counts of possession of a firearm during the commission of a felony; one count of first degree burglary; and three counts of aggravated menacing.

Defendant further claims that the prosecutor had a Judicial officer by the name of Michael P. Reynolds set an unlawful bail of $30,000. dollars for the two illegally added charges in criminal action numbers IN03-04-0614 and IN03-04-0615 depriving the defendant of his liberty.

The prosecutor Natalie Woloshin knew or should have known that adding the additional charges of possession of a firearm during the commission of a felony against the defendant was unlawful act and unlawful conduct. Defendant hereby requests this Honorable Court to dismiss the additional charges in criminal action numbers IN03-04-0614 and IN03-04-0615

2). Defendant further claims that the prosecutor Natalie S. Woloshin exhibited prosecutorial misconduct when she filed an unconstitutionally defective enjoining Indictments. The defendant was illegally prosecuted by both a March Indictment containing the first seven offenses IN03-03-1089; IN03-03-1090; IN03-03-1091; IN03-03-1092; IN03-03-1093; IN03-03-1094; and IN03-03-1095; while the

two illegally added charges make-up the April Indictment under criminal action numbers of: IN03-04-0614 and IN03-04-0615. The enjoining and intertwining Indictment are prohibited by law and the Court non defense attorney should have allowed prosecutor Natalie Woloshin to start trial with this defective and constitutionally deficient document, as such this misconduct was a miscarriage of justice warranting dismissal of defendants convictions.

Defendant claims that he and other latin defendents are routinely prosecuted with this illegally enjoined multiple Indictments, and believes the Department of Justice is intentionally and deliberately targeting latin suspects with the use of this unconstitutionally filed Indictment

The defendant contends that he was Racially discrimin ated and targeted because of his Race and lack of know ledge as to the English criminal law and proceedings.

Defendant has Reviewed a number of Indictments that were filed in New Castle County against white defendents and "not one of them were prosecuted with enjoining Indictments, only that of latin defendents demonstrating a racial discriminatory pattern. The defendant states that the law provides that he must be afforded equal protection under the 14th amendment of the constitution of the United States of America.

As such the defendant hereby requests the Court to dismiss the case against him and have sanctions placed against Natalie Woloshin.

The defendant further suggests that this Court conduct its own independent investigation of the Department of Justice.

## GROUND NO. 3

### SUPERIOR COURT LACKED JURISDICTION

Defendant claims based on the defectively enjoined Indictments filed and used in this case the Superior Court lacked jurisdiction to hear his case warrants the dismissal of the case itself under the 5th and 14th amendment as well as Super. Ct. R. 6

# GROUND NO. 4

## DEFECTIVE GRAND JURY INDICTMENT

Defendant states that the Indictment against him was Defective and constitutionally invalid violating his 5th and 14th constitutional amendment rights. The defendant claims that counts 1 thru 7 was March Indictment, IN03-03-1085, IN03-03-1090, IN03-03-1091, IN03-03-1092, IN03-03-1093, IN03-03-1094 and IN03-03-1095.

While counts 8 and 9 made up the second Indictment which the April Indictment, IN03-04-0614 and IN03-04-0615

The State prosecutor Natalie S. Woloshin enjoined both March and April Indictment's together forming one Indictment and without objection from defense counsel tried and convicted the defendant with this invalid and unconstitutional Indictment. The State should not of been able to start trial without a valid Indictment. It's a mystery as to why the State made the decision to use two separate Indictments in the first place, in that because all of the offenses occurred allegedly on or about February 14, 2003, as such all 9 offenses should have been brought under a single Indictment This constitutional blunder by Woloshin could have been avoided.

The defendants trial attorney apparently did not possess the skill or knowledge of filing Indictments in the State of Delaware, such action is prohibited.

Defendant further claims that the record in this case reflects that only one Indictment was filed. And the record only reflects that the April Indictment was filed which has only two criminal charges in IN03-04-0614 and IN03-04-0615, the two charges in this Indictment were in count 8) possession of a firearm during the commission of a felony and count 9) unlawful imprisonment in the first degree. Defendant claims that he is entitled to relief under the 5th and 14th amendments and in accordance with Super Ct. Crim R. 61(i)(5). SEE U.S. v Voorhies 803 F.2d 1085, 1088.

GROUND NO. 5

INDICTMENT FILED IN VIOLATION OF SUPERIOR COURT
CRIMINAL RULE 8

Defendant claims that he was denied his due process
rights to fundamental fairness and his right to equal
protection all of which deprived him of a fair trial.

Defendant claims the Indictment filed by the prosecution
was filed in violation of Superior Court Criminal Rule 8

This rule provides 8(a) the joinder of offenses and of
defendants, not the joinder of Indictments as is the
question of law before this Honorable Court; defendant's
trial attorney for reasons unknown failed to object to
these enjoining Indictments

This constitutional error in conjunction with all
of the other errors stated in instant motion prevented
the accused from ever receiving a fair trial.

Defendant hereby moves the reviewing Court to dismiss
the charges against him and vacate his convictions.


GROUND NO. 6

CONVICTION OBTAINED BY PERJURED TESTIMONY
BY STATE'S WITNESS, SOLIMAN TORRES INDUCED BY THREATS
AND COERCION OF DETECTIVE CAMPOS

Defendant states that his convictions should be reversed and
he should be awarded a New Trial, based on the perjured
testimony given by State's witness Soliman Torres, all of
which denied him of a fair trial. Const. Amend 5, 14".

Defendant states that Soliman Torres was forced to commit
perjury by threats of being locked up, by Detective
Campos, resulting in her given false testimony based on
coercion, for both fear of Campos and fear of the defen-
dant's brother whom was the person who committed this
criminal acts. The person Campos had no interest in.

18

Defendant claims that his brother was the person whom was having a problem with Moreno the boyfriend of Soliman Torres, Moreno owed a debt and was refusing to pay up. The defendants brother is dark-skinned while the defendant is light-skinned. If you look at the testimony of States witness Grace of trial transcript page 52 lines 5 and 6 on direct by prosecutor Woloshin
Q). Was he dark-skinned or was he light-skinned?
A). Dark-skinned.

This witness testified truthfully had a proper unbiased investigation been done it would have revealed that the defendent's brother looks like him but has a darker complexion. If not for Detective Campos inherent-bias towards the defendant, the defendants brother could have easily of been developed as a suspect. Because of Campos bias was not interested in the witnesses claims that the defendant was not the person responsible for placing the gun to any of these victims head.

Detective Campos was also unaware that States witness 's knew the defendant because there was a previous affair between the defendant and Marisol Ayala. That's why the initial investigation yielded nothing because all the witness's knew the defendant wasn't the guilty party, and never displayed this type of behavior while being in sexual relationship with their mother.

The bias Campos had for the defendant resulted in him making threats against Marisol and Soliman, thereby causing them to make false accusations against the defendant. Detective's Campos's refusal to accept the truth that defendant was factually innocent of these criminal acts angered him, causing him to make threat of locking up the witness's if they did not testify falsely by saying the defendant was the guilty party.

Campos was able to coerce Soliman to falsely accuse the defendant as the person responsible. U.S. v Wallach 935 F.2d 445 (1991)

However Campos was not able to persuade Grace nor Marisol to commit perjury Marisol continued to testify that defendant only looked like the assailant.

While Grace stuck to her original testimony; a review of Grace's direct testimony reveals that prosecutor Wolo shin never requested Grace to point to the person who put a gun to her head, giving rise that the prosecution knew all to well that the defendant was innocent

Defendant claims that the testimony by Solimari Torres was false and perjured and denied him his fundamental rights to a fair trial.

Defendant claims that the lack of competent representation prevented the trial court from determining voluntariness of Solimari and Marisol's testimony in advance of admitting them.

In determining the voluntariness of out-of-court statement the trial court must focus its attention on a totality; of the circumstances overview of the behavior of the interrogators, as well as the mental/physical makeup of the individual being interrogated; to determine whether the individual's will was so overbourne the statements produced were not the product of a rational intellectual and free will. Martin v State, Del. Supr. 433 A.2d 1025.

These false and perjured testimony was inadmissible was clearly the result of coercion and threats, by, Detective Campos and resulted in the defendants conviction.

## GROUND NO. 7
### THE TRIAL COURT ABUSED IT'S DISCRETION IN DENYING DEFENDANT'S REQUEST FOR TRANSLATOR WHILE GRANTING THE STATE'S REQUEST

Defendant claims that the trial court violated his due process rights to fundamental fairness and equal protection of the United States Constitution.

The defendant requested that the Court appoint him a translator because he did not fully understand the

English nor understand the Court proceedings against him; in conjunction with the incompetence and ineffective ness of counsel who did nothing to make him understand the proceedings.

While the Court first agreed to appoint defendant a translator; but when trial was to begin the translator was unavailable; instead of postponing the trial, the Court abandoned it's earlier ruling and forced defendant to stand trial with incompetent counsel and without the aid of a translator even though it initially honored the defendant's earlier request.

However the Prosecutions request was granted while the defendant's request was denied, this action by the trial court clearly shifted the balance of the trial proceed ings in the State's favor. Sheppard v. Maxwell 384 U.S 333.(.

Defendant claims that such action denied him his constitutional rights to fairness and equal protection guaranteed to every U.S. citizen; this unfairness left the defendant without a full understanding as to the trial proceedings forced him to be put on trial with a bad indictment and unable to fend for himself Const. Amend 5, 6, 14 U.S.C.A.

Defendant maintains he is innocent and based on the denial of his fundamental rights, he hereby requests the Court to appoint competent counsel and award him a New Trial.

9

## INEFFECTIVE ASSISTANCE OF COUNSEL

In this portion of the defendants motion, defendant will discuss the errors, omissions and counsel's conduct that rendered him ineffective, depriving him of his 6th amendment right to effective assistance of counsel. Which rendered his trial fundamentally unfair 14.

In order to substantiate a claim of ineffective assistance of counsel the defendant must show that his trial counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that but for counsel's errors and omissions, the result of the Superior Court jury trial would have been different. <u>Strickland v. Washington</u> 466 U.S. 668, 688 (1984)

Meer allegations of ineffectiveness of trial counsel are insufficient and defendant claims that his motion will make and substantiate specific allegations of actual prejudice

Defendant claims that under <u>Strickland</u> 466 U.S. at 689 he will meet the burden of proving by a preponderance of evidence his post-conviction relief claim that his trial attorney was ineffective in in representing at all phases of his trial proceedings and on Direct Appeal.

## GROUND No. 8

Trial counsel was ineffective in failing or refusing to challenge the two changes that were added illegally, counts 8 and 9. P.F.D.C.F: Unlawful imprisonment first degree.

These two changes were added in violation of the defendants due process rights. defendant should have never

had to stand trial for these two criminal offenses which resulted in 3 years more of level 5 time. Had his trial counsel been competent or effective he would have objected to the additionally changes and motioned the court for dismissal, and in all probability the court would have granted the motion.

Counsel's failure here deprived the defendant of his sixth amendment right to counsel, and fell well below the reasonable standard of competence under Strickland

Defendant hereby requests that his convictions for counts 8 and 9 be vacated 6.14. U.S.C.A.

## GROUND No. 9

Trial counsel's representation of the defendant, was deficient unreasonable for failing to file motion to dismiss defective enjoined indictment's pursuant to Superior Court Criminal Rule 12 prior to the commencement of trial. (SEE AND COMPARE) RHODEN ... MORGAN. 846 F.Supp 578 pretrial ineffectiveness.

Failure of trial counsel to file meritorous pretrial motions constitutes ineffective assistance of counsel and establishes "cause" for procedural default. 6th amendment

While being put on trial with a bad defective enjoining indictments of both March and April indictments, resulting in conviction, and more severe punishment. ...

When factually speaking the defendant should have never had to stand trial on this bad indictment, if trial counsel would have moved the trial court for dismissal

Therefore the "prejudice" prong of Strickland is met

Trial counsel obviously lacked both the skill and knowledge or understanding of Superior Court Criminal Rules 8 and 14. Rule 8 allows joinder of defendants and offenses not the joinder of multiple indictments. Under the circumstances counsels representation was unreasonable and defendant is entitled to relief for violations of his 6th and 14th amendment rights.

11

## GROUND No. 10

Trial counsel's failure to conduct independent investigation rendered his assistance ineffective and wholly unprepared despite his clients persistence of innocence; deprived the defendant of a fair trial and his sixth amendment to assistance of counsel. States witness Grace testified under oath that the perpetrator was dark-skinned while counsel's client was light-skinned; strong presumption for independent investigation yet counsel never bothered to do so.

McQueen v. Swenson, 498 F.2d 207

Pre-trial investigation and preparation are the keys to effective representation yet counsel did neither. U.S. v. Tucker, 716 F.2d 576; Sullivan v. Fairman 819 F.2d 1282, 1389.

An investigation by defense counsel would have revealed that the defendants brother was responsible for these criminal acts. States witness Mensol testified that the assailant looked like Chris; States other star witness testified that the person who placed a gun to her head was dark-skinned; referring to the defendants brother.

Counsel's failure and refusal to investigate to support his clients claim of innocence was extremely damaging and virtually left his client without a defense, and assured a guilty verdict for the prosecution.

An investigation would have enabled counsel to develope the defendants brother as a suspect and had the jury of had this evidence presented to it, in all probability the jury would have found the defendant not guilty.

Or at a minimum created a reasonable doubt. It is certainly true that the degree of investigation was needed as well as reasonable; failure to do so let to break down in the adversarial process and substantially altered the outcome violating defendants due process and sixth amendment rights.

## GROUND No. 11

Defendant claims that trial counsel's failure to interview state's witnesses prior to trial was unreasonable and constitutes ineffective assistance of counsel; standard below competence depriving him of 6th amendment right to the assistance of counsel.

Since the State's witnesses were being intimidated, coerced and threatened by Detective Campos it would have been reasonable and rational strategic choice to interview the witnesses independently in the absence of police. Without having to worry about being locked-up, in all probability, had trial counsel would obtained information and or facts to support his clients claim of innocence. It is more likely than not the witnesses would have spoke freely with counsel and revealed the truth that the defendant did not enter their home and commit these acts

Defendant claims that his attorney kept suggesting that he plead guilty and when he refused the plea offer counsel abandoned the cause, made no further attempts to prepare for trial; had no strategy and conceded his guilt. Such conduct by trial counsel failed to hold the prosecution to its burden of proof of persuading the jury that defendant was guilty. Thus, the defendant was deprived of due process, a fair trial and his sixth amendment right to counsel. U.S. v. Swanson 943 F.2d 1070

## GROUND No. 12

Trial counsel was ineffective on cross-examination of state's witness Grace, whom was giving testimony that was exonerating the defendant; yet trial counsel did not cross-examine this key witness for the defense. Counsel failed to ask this witness was his client the man who entered her home and placed a gun to her head. From the testimony

that witness Grace had given of a dark-skinned man
this evidence would have created a reasonable doubt in
the minds of enough jurors to avoid conviction.

At this point of the trial it became evident that the
defendents attorney's effort was pretextual and a useless
charade, case leaking strategy. U.S. v Cronic 466 U.S. 648
Sims v. livesay 970 F.2d 1575 (1992)

Counsel's conduct virtually deprived defendent of any
chance of an acquittal

Counsel's errors and deficiencies are severe and serious
enough to have undermined the confidence of the outcome

It can be said that defendent was denied assistance of
an attorney guaranteed under the 6th amendment of the
constitution. Counsel's conduct and omissions cannot be
relied upon as producing a just result. Strickland v
Washington 466 U.S. at 696.

Based counsels deficient performance defendant is
entitled to reversal of his convictions; warrenting a
New Trial. With competent representation defendant
claims the outcome of his trial results would be
different.

## GROUND No.13

Defendant claims that trial counsel was equally
ineffective on Direct Appeal denying the defendant
of his right to counsel secured by the sixth amendment.
Evitts v. Lucey, 105 S.ct 830

Trial counsel filed a "No-Merit" Appeal all but
abandoning the case itself. The defendant was left to
shift for himself, which a language barrier prevented
him from effectuating a merits brief.

Up to this point the defendants motion raised the
most blatant and fundamental errors committed by
his trial attorney.

14

There were many other errors and deficiencies attribute to counsel as well that show that the defendant was effectively left without the assistance of an attorney

Trial counsel failed to object to inadmissible evidence of bullets and bullet holes found at the defendants residence failure to subject the prosecutions case as to this evidence to get a ruling from the Court as to its admissibility under direct rules of evidence Rule 404 b. In all likelihood the Court would have ruled it inadmissible since the prosecution had no direct knowledge as to when the bullet holes were made, nor whether they were there prior to the defendant renting the residence counsel just stood by allowing this damaging and prejudicial testimony to be presented to the jury without objection.

The prejudice to the defendant clearly outweighed the probative value. This inadmissible and highly prejudical evidence undermined the jury's ability to return an appropriate verdict free of unfairly prejudical effect.

Extremely destructive to defendants ability to receive a fair trial by an impartial jury 6.14 Const. Amend.

Trial counsels failure to interview material witnesses or investigate the case in general constitutes ineffective assistance of counsel, was unreasonable and falls well below the objectively reasonable standard of competence expected of criminal defense attorneys.
Eldridge v. Atkins; 663 F.2d 228; Miller v. Wainwright 298 F.2d 426

Trial counsel's ineffectiveness was evident from the outset of this case, counsel allowed the prosecutor to to add two additional criminal charges well after the fact. The prosecutor could have added as many new charges as she desired counsel would not of objected

Then to compound his dubious effort allowed the prosecution to prosecute the defendant with two enjoining indictments. The most jaded law student would have

15

moved to dismiss the defective indictment. Had trial counsel been in conformity with the applicable laws and Court Rules (Rules) he would have moved to dismiss the indictment. Instead the defendant was put on trial not knowing the indictment was bad.

Every time defendant would inquire as to the status of his case or try to have the applicable laws explained to him, counsel would insist that he plead guilty to all charges

Defense counsel's performance was not only ineffective but counsel abandoned the required duty of loyalty to his client because he refused plea offer. Counsel did not simply make poor strategic or tactical choices he acted with reckless disregard for his clients best interest, and apparently with the intention to weaken his clients case by refusing to challenge or object to the obvious. Osborn v. Schillinger 861 F.2d 612.

The defendant respectfully submits that these errors committed by defense attorney, fatally undermined the reliability of the jury's verdict.

Counsel's conduct at trial left no grounds for appeal as such: the conclusion is unavoidable that counsel's conduct so undermined the proper functioning of the adversarial process that the trial and appellate proceedings cannot be relied upon as having produced a just result." Strickland, supra at 686.

Defendant submits that a new trial could in all reasonable probability bring about a different verdict providing competent assistance be appointed. Strickland v. Washington 466 U.S. 668; Younger v. State Del. Supra., 580 A.2d 552

## CONCLUSION

WHEREFORE, for the reasons and authorities cited herein, defendant moves the Court for an order vacating his convictions and ordering a new trial.

Cristian DeJesus S.
CHRISTIAN DEJESUS
Delaware Corr' Center
1181 Paddock Road
Smyrna, DE 19977

July    , 2005

## Certificate of Service

I, CHristian Dejesus , hereby certify that I have served a true

and correct cop(ies) of the attached: Motion For Post-Conviction Relief

and supporting documents upon the following

parties/person (s):

TO: New Castle County Prothonotary TO: _____

Superior Court _____

500 N. King Street _____

Suite 500, Lower level 1 _____

Wilmington, DE 19801 _____


TO: _____     TO: _____

_____        _____

_____        _____

_____        _____

_____        _____


**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this _____ day of July , 200 5

Christian DeJesus S.



**ORIGINAL**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
### IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,      )
)
)
v.                     )    ID. No. 0303004601
)
CHRISTIAN DEJESUS,    )
)
Defendant.     )

0 6 ~5 5 3

FILED

SEP 0 6 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Scanned

Submitted: July 28, 2005
Decided: September 27, 2005

## OPINION

*Defendant's Motion for Postconviction Relief.*
*Summarily Dismissed.*

*Appearances:*

Christian DeJesus, *pro se.*

Steven Wood, Esquire, Wilmington, Delaware.
Deputy Attorney General.

**JOHN E. BABIARZ, JR., JUDGE.**

*Exhibit - B*

This is the Court's decision on Defendant Christian DeJesus' motion for postconviction relief filed pursuant to Super. Ct. Crim. R. 61 ("Rule 61"). As explained below, Defendant's alleged grounds for relief have no basis in law or in fact, and his motion is summarily dismissed.

**Posture**. A Superior Court jury found Defendant guilty of one count of first degree burglary, one count of first degree unlawful imprisonment, three counts of aggravated menacing and four counts of possession of a firearm during the commission of a felony. This Court sentenced Defendant to 12 years of imprisonment followed by probation, and the Delaware Supreme Court affirmed.[1] Defendant now seeks to have his convictions vacated and the case against him dismissed, or at a minimum to have a new trial.

**Issues**. Defendant contends that most of the issues he now raises were not previously raised because defense counsel's representation was constitutionally ineffective. Defendant asserts that the police coerced the witnesses into testifying against him to obscure the fact that his look-alike brother committed the crimes, and that defense counsel participated in the cover-up by not interviewing the State's witnesses to find out what really happened. He argues that the prosecutor illegally added two charges to the indictment, thereby divesting this Court of jurisdiction over

---

[1]*DeJesus v. State*, 2005 WL 65865 (Del.).

Page 2 of 8

his case. He contends that defense counsel deprived him of any chance of acquittal by choosing not to cross-examine a six-year-old witness. He renews his argument, which failed on direct appeal, that this Court abused its discretion in denying his motion for a translator. Finally, he condemns defense counsel's representation on direct appeal.

**Evidence adduced at trial.** The State offered the testimony of Marisol Ayala and her two daughters, whose house Defendant barged into on Feb. 14, 2003. Ms. Ayala stated that she was sitting on her porch at 116 Scott Street in Wilmington when a man drove up in a big green car. He got out of the car and asked Ms. Ayala for the whereabouts of a man named "Moreno." When Ms. Ayala said that Moreno was not in her house, he grabbed her by the arm, pointed a gun at her head, and told her to open the door to the house. By this time, Ms. Ayala was crying and screaming. She opened the outside door and knocked on the inside door, which her five-year-old daughter had locked. When the little girl unlocked the door, the intruder yanked it open, grabbed the child, and held his gun to her head. He threatened to kill the little girl if Ms. Ayala did not tell him where Moreno was. The mother cried and screamed, saying over and over that she did not know where Moreno was. She begged the gunman to leave her child alone.

Ms. Ayala's teen-aged daughter was in the kitchen when she heard a ruckus in the other room. She came to the front room where she saw a man holding a gun to her younger sister's head. She ran from the house because she was pregnant and feared for her child. She saw the man drive away in a blue/green car.

Detective Wilfredo Campos of the Wilmington Police Department also testified on the State's behalf. He stated that he interviewed Ms. Ayala and her older daughter shortly after the crimes took place. Both women were cooperative and described the events summarized above. Ms. Ayala told him that she thought the man's name was "Chris." Det. Campos testified that Ms. Ayala was cooperative at the outset of the investigation but that when he talked with her just prior to trial she cried and stated that she was scared of the defendant.

On March 6, 2003, Det. Campos stopped a car that fit the description provided by the victims. The driver was Christian DeJesus, and the car was a 1999 Chrysler New Yorker. When Defendant's room was subsequently searched, the police found ammunition for a 9-millimeter firearm and a .38-caliber firearm, as well as a Pep Boys receipt referring to a 1999 Chrysler New Yorker with the same PA tag number as Defendant's car and made out to Christian DeJesus.

Det. Campos put together six photos of men generally matching the description of the burglar, and showed them to Ms. Ayala and her older daughter. Both women

readily identified the photo of Defendant as the man who burglarized their home.

Defendant took the stand and testified that he and his brother had rented a room in a house they shared with a number of other people. He stated that the padlock on the door to their room was to prevent other people from entering the room in their absence, but that the ammunition found in the ceiling did not belong to him. He also testified that he approached Ms. Ayala's older daughter in the street one day and asked her why she had said he was the person who had barged into her home. He stated that he did not commit the charged crimes.

**Discussion.** Defendant asserts that the prosecutor illegally changed the indictment by adding one count of unlawful imprisonment and an additional weapons charge, and that defense counsel was ineffective for not moving to dismiss on these grounds. The State has broad although not unlimited discretion to prosecute as it sees fit.[2] The additional charges meshed with the facts as shown by the evidence and as defined by the law. The prosecutor did not abuse her discretion in bringing the additional charges. It follows that there is no merit to Defendant's related argument that defense counsel should have moved to dismiss because the allegedly illegal

---

[2]*Albury v. State*, 551 A.2d 53, 61 (Del. 1988) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985) (stating that as long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision of whether to prosecute and what to charge generally rests in his discretion)).

indictment divested this Court of jurisdiction. Defendant has not shown either that

counsel's conduct below a reasonable standard or that he was prejudiced by counsel's

representation, as required by *Strickland v. Washington.*[3]

Defendant alleges that Det. Campos coerced the witnesses into falsely

testifying against him, and that defense counsel was ineffective for failing to bring

this fact to light. He argues that Ms. Ayala's letters of recantation were truthful

whereas her trial testimony was not. On cross-examination, Ms. Ayala stated that

prior to trial she had written two letters proclaiming Defendant's innocence. Defense

counsel also elicited the fact that Det. Campos had told Ms. Ayala that she would be

jailed if she did not testify against Defendant.    Thus the record eviscerates

Defendant's claim that defense counsel was unaware of the facts surrounding Ms.

Ayala's contradictory statements. The jury heard both versions of Ms. Ayala's

recitation of the events, and chose to believe what she had initially told Det. Campos

and what she testified to at trial, that is, that Defendant was the person who barged

into her home and threatened both her daughter and herself with a gun. The jury is

the finder of fact,[4] and the jury has spoken.

Defendant also asserts that his brother committed the crimes for which he has

---

[3]466 U.S. 668, 688, 694 (1984).

[4]*Chao v. State*, 604 A.2d 1351, 1363 (Del. 1992).

Page 6 of 8

been convicted, and that defense counsel would have discovered this if he had conducted an adequate investigation. Having heard the Defendant testify at trial, the Court has difficulty treating this claim as anything but a highly optimistic afterthought. Defendant spoke from the stand about the room he and his brother had rented together, the padlock they put on the door to their room, and the car he occasionally let his brother drive. He never stated that his brother committed the crimes or that he and brother could be mistaken for each other, although he had ample opportunity to so testify. Nor did Defendant make this claim on direct appeal, although he raised two other arguments. This assertion defies common sense and does not constitute a viable claim of ineffective assistance of counsel.

Defendant also argues that defense counsel was ineffective for failing to cross examine Ms. Ayala's younger daughter, who was six years old at the time of trial. Defendant also asserts that the child's direct testimony exonerated him, which is flatly untrue. Furthermore, the decision not to cross examine a child witness falls within the broad range of strategic choices that will not be dissected without a showing of prejudice,[5] which Defendant has not made.

Defendant argues that this Court erred by not provided him with a translator at trial. This issue was resolved against him on direct appeal, and is therefore barred

---

[5]*Stiickland v. Washington, supra.*

Page 7 of 8

by Rule 61 (I) (4), unless warranted in the interest of justice. Defendant has not triggered this exception, which requires a showing that subsequent legal developments have revealed that this Court lacked authority to convict or punish him.[6] This issue is barred from reconsideration.

**Conclusion.**    For the reasons stated herein, Defendant's motion for postconviction relief is summarily dismissed.

**It Is So ORDERED.**

_____
Judge John E. Babiarz, Jr.

JEB,Jr./bjw
Original to Prothonotary

---

[6]*Flamer v. State*, 585 A.2d 736, 746 (Del. 1994).

CERTIFICATE OF SERVICE

I, _Christian DeJesus_, hereby certify that I have served a true and correct cop(ies) of the attached: _Notice of Appeal_ _____ upon the following parties/person(s):


TO: _Loren C. Meyers, Esquire_

_Chief of Appeals Division_

_Department of Justice_

_820 N. French Street_

_Wilmington, Delaware_

_19801_

TO: _CLERK OF THE SUPREME COURT_

_SUPREME COURT_

_P.O. Box 476_

_Dover, DE 19903_

_____

BY PLACING SAME IN A SEALED ENVELOPE and depositing same in the United States Mail at the Delaware Correctional Center, Smyrna, DE 19977,

On this _13_ day of _10_, 200_5_.

_Christian DeJesus_

**ORIGINAL**

IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTIAN DEJESUS ,

DEFENDANT Below,
Appellant,

V.

STATE OF DELAWARE ,

PLAINTIFF Below,
Appellee.

No. _____, _____

0 6 - 5 5 3 -



FILED

SEP 0 6 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Scanned

NOTICE OF APPEAL

To:    SUPREME COURT CLERK

PLEASE TAKE NOTICE that Christian Dejesus ,

Defendant , below appellant, does hereby appeal to the Supreme Court

of the State of Delaware, from the order in State v Dejesus

of the Superior Court, in and for New Castle , County, by

Schw E. Babiarz Jr. , dated September 27, 2005, in Case Number

0303004i601 in that court. A copy of the decision sought to be reviewed

is attached hereto.

*Exhibit-C*

Form Rev. 4/1/98

ORIGINAL

In The Supreme Court of The State of Delaware

Christian Dejuses,

No. 499, 2005

Defendant-Below,
Appellant,

06 - 553 -

v.

FILED

SEP 0 6 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
Scanned

State of Delaware

Plaintiff-Below,
Appellees.

Appellant's Opening Brief

This is appellant opening brief pursuant to Supreme Court, Rule 15. However, other than what's presented in this brief, the appellant will rely on the Memorandum of Points and Authorities present to the Superior Court in Support of his Post-Conviction Motion, attached hereto as exhibit-A.)

I. Whether The Totality of Appellant's Court Appointed Counsel's Representation Fell Below A Standard of Reasonableness And Violated Appellant's Sixth And Fourteenth Amendment Rights As Guaranteed By The Constitution of The United States. U.S. CA. Const. Amends. 6 And 14.

Exhibit-D

1). That the Sixth Amendment provides that in all Criminal prosecutions, the accused shall enjoy the right to have Counsel... and guarantees the right to effective assistance of Counsel in Criminal prosecutions. The right to effective assistance of Counsel applies to both Federal and State prosecutions in Criminal cases. See Gideon V. WainWright, 372 U.S. 335, 342 (1963) (Sixth Amendment right to Counsel in Criminal proceedings applies to States through the Fourteenth Amendment). See Strickland V. Washington, 466 U.S. 668, 692 (1984).

In appellant's Case the Court must evaluate Counsel's performance to determine whether absent Counsel's errors the appellant would not have been found guilty... and the outcome would have been different, but for Counsel's errors.

2). That Counsel's failure to investigate the Conflicting Stories presented by the victims and to present evidence in mitigation before the Court, at trial, was ineffective assistance, because jury would probably have found the appellant not guilty in light of the mitigating factors. Strickland V. Washington, 466 U.S. 387, 695 (1985); Williams V. Taylor, 529 U.S. 362, 397 (2000); Germyn V. Horn, 266 F.3d 257, 309-12 (3rd Cir. 2001); Lockett V. Anderson, 230 F.3d 695, 714-16 (5th Cir. 2000). Also, Counsel failure to investigate or prepare mitigation evidence regarding appellant's language barrier and request for and interpreter due to this Spanish speaking dialect, and limited understanding of the English language, constitutes ineffective assistance of Counsel. See Cone V. Bell, 243 F.3d 961, 978-79 (6th Cir. 2001); Emerson V. Gramley,

(2)

91 F.3d 898, 906 (7th Cir. 1996). Antwine v. Delo, 54 F.3d 1357, 1365-68 (8th Cir. 1995); Ainsworth v. Woodford, 268 F.3d 868, 873-74 (9th Cir. 2001); Battenfield v. Gibson, 236 F.3d 1215, 1234-35 (10th Cir. 2001).

3). Appellant's Counsel stated that there was no use in presenting mitigating evidence, because the victims testimony would outweigh any mitigating factors, Constitutes ineffective assistance of Counsel. See Dobbs v. Turpin, 142 F.3d 1383, 1386-91 (11th Cir. 1998). The appellant was indeed, prejudiced by Counsel's representation, as set forth in Strickland v. Washington. This so, because the Court's "Opinion" denying appellant's Motion For Post Conviction Relief states explicitly that, Victim Ayala had written two letters proclaiming appellants innocence. The Court went on to say that the jury heard both versions of Victim Ayala's recitation of the events, but chose to believe what she had initially said from the beginning, that the appellant was the person who barged into her home and threatened her and her daughter with a gun. Therefore the Court abused its discretion and committed plain error, because no determination was set forth by the Court as to why the jury chose to believe Victim Ayala's initial story of, rather than her two letters of recantation that the appellant was actually innocent. (See Super. Ct. Opinion page 6 of 8). Thus, Constitutes ineffective assistance Counsel.

(3)

4). The appellant has set forth and established that defense Counsel's representation/assistance fell outside the wide range of reasonable professional assistance. <u>Strickland V. Washington</u>, 466 U.S. 668, 689 (1984). Counsel's performance fell below an objective standard of reasonableness, and there exists a reasonable probability that, but for Counsel's unprofessional errors the result of the proceedings would have been different. Counsel's failure to raise the mitigating factors as set forth was, "sufficiently egregious and prejudicial."

5). Under the circumstances, Counsel could have made non frivolous and meritorious arguments on appeal. By not doing so, appellant was prejudiced by Counsels errors. <u>Mason V. Hanks</u>, 97 F.3d 887, 894 (7th Cir. 1996); <u>Restrepo V. Kelly</u>, 178 F.3d 634, 640-41 (2d Cir. 1999. That the record is not sufficiently developed regarding merits of appellant's ineffective assistance claim due to the lower Court's abuse of discretion to develope such a record. That Counsel should have been compelled to respond to appellants ineffective assistance claims.

Wherefore: The appellant prays that the Court will vacate the lower Courts' opinion and reverse and remand same.

Dated: 12-19-05

Appellant, pro Se,

Christian DeJuses
1181 Paddock Road
Smyrna, Delaware
19977.

(4)

<u>Certificate of Service</u>

This is to Certify that I, Christian Dejuses, did cause to be served a true and Correct copy of the "Appellant's Opening Brief" on the following named person(s)/ agency by placing same in the United States Postal Service at the <u>Delaware Correctional Center, Smyrna Delaware 19977</u>, on this <u>19th</u> day of <u>December</u> 2005.

To: Attorney General Office
Department of Justice
820 N. French Street
Wilmington, Delaware 19801

Dated: 12-19-05

Appellant, Pro Se,

Christian Dejuses
1181 Paddock Road
Smyrna, Delaware
19977.

(5)

ORIGINAL

IN THE SUPREME COURT OF THE STATE OF DELAWARE



CHRISTIAN DEJESUS,                    §
                                      §    No. 499, 2005
        Defendant Below-              §
        Appellant,                    §
                                      §    Court Below—Superior Court
        v.                            §    of the State of Delaware
                                      §    in and for New Castle County    0 6 : 5 5 3
STATE OF DELAWARE,                    §    Cr. ID No. 0303004601
                                      §
        Plaintiff Below-              §              FILED
        Appellee.                     §
                                                  SEP 0 6 2006

                      Submitted: March 24, 2006       U.S. DISTRICT COURT
                      Decided: May 30, 2006           DISTRICT OF DELAWARE

Before **STEELE**, Chief Justice, **HOLLAND** and **RIDGELY**, Justices

## O R D E R

This 30th day of May 2006, upon consideration of the briefs of the

parties, it appears to the Court that the judgment of the Superior Court

should be affirmed on the basis of and for the reasons set forth in its decision

dated September 27, 2005.

NOW, THEREFORE, IT IS ORDERED that the judgment of the

Superior Court is AFFIRMED.

                              BY THE COURT:

                              Chief Justice

*Exhibit E*

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,     Cr. A. No. IN03031089-95 and
IN03040614-15

    Plaintiff,

v.

    JUN 2 ? 2004

CHRISTIAN DEJESUS,

    Defendant.

BEFORE:  HONORABLE JOHN E. BABIARZ, JR., J.
and jury

APPEARANCES:

    NATALIE S. WOLOSHIN, ESQ.
    Deputy Attorney General
     for the State

    RALPH D. WILKINSON, IV, ESQ.
    Office of the Public Defender
     for the Defendant



    TRIAL TRANSCRIPT
    May 13, 2004

DOMENIC M. VERECHIA, RPR
SUPERIOR COURT OFFICIAL REPORTERS
500 N. King Street, Suite 2609, 2nd Floor
Wilmington, Delaware 19801-3725
(302) 255-0710

---

**3**

**I N D E X**

OPENING STATEMENTS
Ms. Woloshin          page 18
Mr. Wilkinson         page 25

GRACE ALMODOVAR
Ms. Woloshin          page 29

MARISOL AYALA
Ms. Woloshin          page 35
Mr. Wilkinson         page 48
Ms. Woloshin          page 56
Mr. Wilkinson         page 58

SOLIMARI TORRES
Ms. Woloshin          page 59
Mr. Wilkinson         page 72
Ms. Woloshin          page 75

WILFREDO CAMPOS
Ms. Woloshin          page 77
Mr. Wilkinson         page 95
Ms. Woloshin          page 103
Mr. Wilkinson         page 107

State's Exhibit Nos. 1 through 6      page 45
Defendant's Exhibit Nos. 1 and 2      page 51
State's Exhibit No. 7        page 66
State's Exhibit Nos. 8, 9, and 10      page 85
State's Exhibit No. 11       page 104

*Exhibit- F*

---

**3**

1        May 13, 2004
              Courtroom No. 6A

2              11:26 a.m.

3  PRESENT:

4    As noted.

5       - - - - -

6      (The following exchange between the parties took place in the conference room behind Courtroom 6A.)

7    THE COURT:  Okay.

8    MR. WILKINSON:  Your Honor, just a few moments

9  ago, about five minutes ago, Mr. DeJesus brought to my

10  attention that he wanted an interpreter. I've spoken

11  with him before in English. He speaks Spanish and some

12  English.

13    He started bringing up some other concerns with

14  my representation. It appears that he may want another

15  attorney. That's why I've just asked to let him have

16  the opportunity to address you his concerns.

17    THE COURT:  Mr. DeJesus?

18    THE DEFENDANT:  My English is no good. You

19  understand this. I think I need -- I think not only the

20  truth, I need to show you I'm innocent.

21    I need -- I think Mr. Wilkinson don't put a lot

22  of attention on my case. I don't have all my paperwork.

23  And I need my paperwork to tell him how he can hurt me.

---

**4**

1  And I feel -- I mean, Mr. Wilkinson today told me about

2  the time, the plea. It's good if I innocent and I free

3  to try to plea. I don't have nothing behind him. You

4  know what I'm saying?

5    I don't pay money to him. He try to help me.

6  I understand that. I feel in my heart I need more help.

7  I don't care what people say. I'm innocent person. I

8  can't sign a plea for two, three, whatever years,

9  because I got my family. And I never been in the house,

10  what counts. And I never do something wrong with that

11  person.

12    I don't know about law a lot. But if I got a

13  right to get another lawyer, and I got a chance to talk

14  to my lawyer and try to make this defense, I need you,

15  please, take consideration on my person, because I'm

16  innocent. I never been in trouble like that before.

17  And I got 27 years old and I never, never, never

18  nobody -- I never fight with nobody.

19    So if I got the right to get another lawyer, I

20  say, please, I need more help. Because I feel I can

21  lose. And I can't lose because I got my family. I'm an

22  innocent person. I appreciate what he did for me. If I

23  got a right to get another person and try to show you my

5

1 innocence, I want you to do it for me, if I got a right,
2 if you can do it.
3      THE COURT: You don't have the right to get
4 another lawyer. You have the right to hire your own
5 lawyer. If you're going to have the services of the
6 public defender, then you have to accept the attorney
7 that the public defender assigns to you. That's
8 Mr. Wilkinson.
9      THE DEFENDANT: I don't have choice?
10      THE COURT: You don't have a choice. In fact,
11 it's too late to hire your own lawyer. He would have to
12 come in and start the case today. Obviously, he can't
13 do that. So that request is denied.
14      It's also obvious from your speaking to me that
15 your command of the English language is sufficient that
16 an interpreter is not required. And if it was felt that
17 you needed an interpreter, the time to make that request
18 would have been before the trial was just about to
19 begin. So that request is also denied.
20      Is there anything else?
21      MR. WILKINSON: Not that I can think of. If I
22 could have just one second.
23      (Pause.)

6

1      THE DEFENDANT: I don't know. If you say I
2 can't get a lawyer and I need -- I know I'm going to
3 lose. It's better you don't do a trial and I sign the
4 paper. You can give me whatever time you want. I'm
5 going to lose. I know -- I can't do my...
6      (Pause.)
7      MR. WILKINSON: I don't believe there's
8 anything more.
9      THE COURT: Okay. I've ruled on the request.
10 Mr. DeJesus wants to go to trial. We will go to trial.
11 We're ready to start.
12      (Whereupon the proceedings reconvened to
13 Courtroom 6A and a jury was selected and sworn.)
14      THE CLERK: Members of the jury, you have all
15 been severally sworn or affirmed. Stand together and
16 hear the evidence.
17      Your Honor.
18      THE COURT: You may be seated. It's five
19 minutes to 12. I think the first thing we'll do in this
20 trial is go to lunch. Before I excuse you, though, let
21 me give you two instructions that will prevail
22 throughout this trial.
23      The first is that the jury should not discuss

7

1 the case among themselves as the trial proceeds. This
2 afternoon you will begin to hear evidence, and you'll
3 undoubtedly start to form an opinion in your mind. You
4 may hear things later on that may cause you to change
5 your mind. That's always easy to do when your opinion
6 is held to yourself. It's simply a fact of human
7 nature; sometimes when a person expresses an opinion,
8 it's harder to change it later on. So it's for the
9 purpose of helping you keep an open mind that you're
10 instructed not to discuss the case until you enter
11 deliberations. Of course, it will be your duty then to
12 talk about the case.
13      The second instruction is you shouldn't talk
14 about the case with anyone outside the courtroom. Your
15 sworn duty as jurors will be to arrive at a verdict
16 based solely on what you see and hear in court
17 unaffected by any outside influence. And the only way
18 to protect yourself from being influenced even
19 unintentionally or unconsciously is simply not to talk
20 about the case. Once it's over, you're free to discuss
21 it with anyone you choose.
22      We will reconvene at one o'clock. And the jury
23 is now excused for lunch. The bailiff has a couple of

8

1 instructions to give you.
2      (The jury left the courtroom at 11:54 a.m.)
3      THE COURT: Mr. Wilkinson.
4      MR. WILKINSON: Yes, Your Honor. It's a matter
5 I should have brought up before. It deals with one of
6 the witnesses, who, I believe, is 15 years old,
7 Solimari --
8      MS. WOLOSHIN: She's now 17 years old.
9      MR. WILKINSON: She does have a juvenile record
10 of possession with intent to deliver cocaine and
11 conspiracy second in 2002, or it's an adjudication of a
12 delinquency. And I would like to be able to impeach her
13 on that.
14      THE COURT: Any objection?
15      MS. WOLOSHIN: Yes, Your Honor, I do.
16      I think that before it could be admitted there
17 has to be a balancing test specifically in 609(d)
18 dealing with a juvenile adjudications. It's generally
19 not admissible. However, the Court may, in a criminal
20 case, allow evidence of a juvenile adjudication of a
21 witness. If the conviction of the offense would be
22 admissible to attack the credibility of an adult and the
23 Court is satisfied that the admission is in evidence,

9

1  it's necessary for a fair determination of the issue of

2  guilt or innocence.

3      This offense happened last year. In 2003, she

4  was adjudicated delinquent before this incident even

5  occurred. I don't know how it would be relevant to her

6  testimony at all or to a fair determination of this

7  case.

8      And the adjudication has to be -- the probative

9  value has to outweigh its prejudicial effect. I don't

10  know that's ever been established or proffered.

11      MR. WILKINSON: Your Honor, I would say that

12  the fact that her adjudications happened prior to the

13  alleged event, it's not really all that relevant.

14      THE COURT: It was adjudicated before

15  February 14th of last year?

16      MS. WOLOSHIN: Yes.

17      MR. WILKINSON: I believe so.

18      THE COURT: It's for conduct occurring when?

19      MS. WOLOSHIN: I can hand this up to the Court.

20  It was -- October 18th of 2002 was the date of the

21  arrest. I don't know the date of the conviction. I can

22  hand this up to the Court -- I'm sorry -- the date of

23  adjudication of delinquency.

10

1      MR. WILKINSON: The fact it happened before is

2  irrelevant. It happens all the time that people who are

3  adjudicated or guilty prior to the events in question.

4  I don't see why this is any different. The fact that

5  she was adjudicated 2002, it's not really that remote in

6  time. And they are matters that, you know, would have

7  been felonies if she would had been an adult. Since she

8  is not the defendant in this trial, a witness, I believe

9  it should be admissible.

10      THE COURT: I'll allow the cross-examination.

11      MR. WILKINSON: Thank you, Your Honor.

12      MS. WOLOSHIN: Your Honor, there is one issue

13  which obviously is not ripe for consideration. But if

14  there is an attack on the out-of-court identification of

15  at least one of the witnesses, or possibly two, the

16  State may at that time seek to admit the actual line-up

17  into evidence, which has been shown to defense counsel.

18      THE COURT: Okay. If it comes up, I'll decide

it then.

20      Anything else?

21      Court's in recess.

22      (A lunch recess was taken at 11:58 a.m.)

23

11

1                      1:08 p.m.
                    Courtroom No. 6A

2                    The same day

3  PRESENT:

4      As before noted.

5

6      THE COURT: Ready for the jury?

7      MR. WILKINSON: If I could address real quick,

8  Your Honor. I didn't go into this before when

9  Mr. DeJesus asked for an interpreter.

10      Before this trial, I met with him, and we've

11  had at least two very lengthy conversations. And I've

12  always communicated in writing with him. I didn't think

13  there was an issue of him needing a translator. He

14  first made me aware of it five minutes before I met with

15  you. I wanted to put that on the record. However, he

16  is very upset about there not being a translator.

17      Right after we picked the jury, I called our

18  translator who works in our office, Jorge Jenkins. And

19  I left a message for him to be here and told him the

20  trial is starting at one o'clock. I've been told down

21  in the office he's supposed to be in our office at two

22  anyway, and they're going to send him up.

23      I know Your Honor did the ruling but just --

12

1      THE COURT: Your translator will be available

2  beginning at two o'clock?

3      MR. WILKINSON: That's what I was told

4  downstairs. Because Mr. DeJesus keeps on bringing it up

5  to me about he's upset. I understand Your Honor's

6  ruling --

7      THE COURT: I know that you do. And I'm

8  willing to delay the trial for another 45 minutes so

9  that your translator can be available. Although, as I

10  said earlier, I don't believe it's necessary because

11  Mr. DeJesus communicated with me concerning his

12  representation with no problem at all.

13      I also know that most of the witnesses in this

14  case will be testifying in Spanish, so there should be

15  no difficulty in his understanding that.

16      And out of an abundance of caution, I will wait

17  to two o'clock. If the translator is not here by then,

18  we'll start without him.

19      THE COURT: Ms. Woloshin.

20      MS. WOLOSHIN: Your Honor, since we have to

21  wait until two, I just want to bring one matter to the

22  Court's attention which I discussed with Mr. Wilkinson.

23      The first State's witness is going to be Grace

13

1  Almodovar. I already said she was five. She's actually
2  six years old. She'll be seven in June.
3       There was a request made by the social worker
   that's on the case that her dad be permitted to sit with
5  her during her testimony. He understands he's not
6  allowed to talk to her, just to provide her some
7  comfort.
8       THE COURT: Sit adjacent to her.
9       MS. WOLOSHIN: That's fine.
10      I put him on the witness list out of an
11 abundance of caution. I don't know if he is going to
12 testify. He's definitely not going to be testifying as
13 far as anything Grace Almodovar says or said before or
14 anything related to her testimony.
15      THE COURT: If he's going to be present during
16 her testimony, it's going to be a problem with
17 sequestration. I would assume counsel wants witnesses
18 sequestered.
19      MR. WILKINSON: Yes. I didn't get a chance to
20 speak about this to Mr. DeJesus. If I could just...
21      (Pause.)
22      MR. WILKINSON: Yes, Your Honor. I was told by
23 the State. I thought about this before now. And I

14

1  explained to Mr. DeJesus my thinking in this, that if
2  the father wants to sit next to the girl, he's not going
3  to come back to testify to anything dealing with the
4  little girl, that we don't have an objection to that.
5       THE COURT: Okay.
6       MR. WILKINSON: I don't see how it's going to
7  adversely affect Mr. DeJesus at all in this case and
8  could one way be an --
9       THE COURT: That's fine.
10      Bring the jury in so I can tell them about the
11 delay.
12      (Pause.)
13      (The jury entered the courtroom at 1:15 p.m.)
14      THE COURT: Ladies and gentlemen, there's going
15 to be a brief delay in the beginning of the trial. The
16 defendant has requested the assistance of an
17 interpreter. And that interpreter is not available
18 until two o'clock.
19      Now, the Court has previously determined that
20 Mr. DeJesus speaks English well enough to proceed with
21 this trial. Since he has made arrangements to have
22 someone to assist him, but that person isn't available
23 until two o'clock, I've agreed that it's appropriate

15

1  that we delay the start of the trial until then.
2       It should not affect the ending time of the
3  trial. It should still be in your hands tomorrow for
4  decision.
5       I'm not going to ask you to stay in the jury
6  room for the next 40 minutes. You're free to leave and
7  go outside. Just come back to the jury room around
8  two o'clock, and we'll get started then.
9       The jury is now excused.
10      (The jury left the courtroom at 1:16 p.m.)
11      THE COURT: Okay. Court will be in recess
12 until two o'clock.
13      (A recess was taken.)
14      THE COURT: Bring in the jury.
15      I understand your interpreter hasn't shown up.
16      MR. WILKINSON: The problem is he's in a trial.
17 He's in a trial with Mr. Hillis, which it looks like
18 they still have to do closings and instructions. And
19 I've explained --
20      THE COURT: Mr. DeJesus has demonstrated he has
21 a good understanding of English, so we'll go forward.
22      Bring in the jury.
23      MR. WILKINSON: Okay.

16

1       (The jury entered the courtroom at 2:04 p.m.)
2       THE COURT: All right, ladies and gentlemen.
3  The interpreter that Mr. DeJesus wanted to use is
4  involved in another trial right now and can't be here.
5  As I indicated before, pretrial I examined the issue and
6  determined that there was good English fluency here.
7       You're about to hear a criminal case. And you
8  probably know many of the principles I'm just going to
9  state, but I'd like to take a moment to remind you of
10 them.
11      The first is, of course, that the defendant is
12 presumed innocent. That is, he is an innocent person
13 unless and until the evidence convinces you beyond a
14 reasonable doubt that he is guilty. The burden of proof
15 is on the State to prove the defendant guilty. The
16 defendant has no burden to prove his innocence or even
17 to present any evidence on his behalf.
18      I'm going to give you a somewhat longer
19 explanation of the term "reasonable doubt" at the end of
20 the case. It's a common sense term, and please keep it
21 in mind throughout these proceedings. The defendant is
22 innocent until proven guilty beyond a reasonable doubt.
23      In a few moments you will hear that the

17

1  defendant has been indicted. An indictment is simply a
2  written statement of the charges against the defendant.
3  In and of itself it is entitled to no weight whatsoever.
   So don't allow your judgment in this case to be
5  influenced even a little bit by the simple fact that
6  there's been an indictment.
7       In a few minutes the attorneys will be giving
8  you their opening statements. Now, the opening
9  statements are not evidence. Nothing the attorneys say
10 in this case is evidence. The evidence will come from
11 the witnesses on the witness stand and any physical
12 objects or documents introduced into evidence.
13      The attorneys in their opening statements will
14 give you a better idea of what this case is all about,
15 sort of a general outline of what they expect the
16 evidence to show.
17      Now, I can tell you, presiding over 500 trials,
18 that nobody can predict exactly what the evidence is
19 going to show. Some things always change even a little
20 bit. So don't take the opening statements for anything
21 more than what they are, a general outline to help you
22 understand the testimony as you begin to hear it.
23      Now, by telling you that nothing that counsel

18

1  say is evidence in itself, I don't mean to downgrade
2  their role. They are essential to the presentation of a
3  fair trial. And they are officers of this court much in
4  the same way that you are and that I am.
5       Ms. Woloshin, you may give your opening
6  statement.
7       MS. WOLOSHIN: Thank you, Your Honor.
8       May it please the Court, counsel, as a parent,
9  your worse, most frightening nightmare is someone
10 breaking into your house at gunpoint and taking that gun
11 and putting it into your child's head. That is what the
12 defendant did.
13      Valentine's Day last year at about 8 p.m. in
14 the evening, Marisol Ayala was with her two children at
15 her house in the city of Wilmington on the west side.
16 She was outside on the porch smoking a cigarette when
17 the defendant pulled up, demanded to know where a
18 certain person was. And when she told him she didn't
   know where he was, he pulled a gun out on her.
20      He then demanded to go into her house.
21 Ms. Ayala tried to stall because she knew her children
22 were inside. He forced her to knock on the door by
23 holding a gun to her. And when she knocked on the door,

19

1  her little five-year-old answered it. Little Grace
2  Almodovar answered the door, opened it.
3       The defendant then threw Marisol Ayala aside,
4  grabbed little Grace, and did the unthinkable. He
5  grabbed little Grace and put the gun to her head, right
6  up to a five-year-old's head and demanded her mother to
7  tell him where this person was. She kept saying, I
8  don't know; he doesn't live here.
9       Ms. Ayala's other daughter, Solimari Torres,
10 who was then 15 years old, was in the kitchen. She
11 heard what was going on and came out to see what was
12 going on. When she came out, she screamed, saw her
13 little sister with the gun to her head, her
14 five-year-old little sister, became dizzy and fell to
15 the ground crying, screaming.
16      The defendant then came over to her, put a gun
17 to her head, demanded to know where this person was.
18 She said, He's not here. The defendant then ran
19 throughout the house to see if this person was there.
20 Of course, he wasn't.
21      Then the defendant left, leaving these three
22 helpless people terrified in their homes. But as the
23 defendant left, got back into his car, he took out the

20

1  gun, he fired some shots from his gun.
2       Good afternoon, ladies and gentlemen. My name
3  is Natalie Woloshin. I'm a prosecutor with the State of
4  Delaware. Seated at counsel table with me is Detective
5  Wilfredo Campos with the Wilmington Police Department.
6  He's what's known as a chief investigating officer. As
7  such, he's permitted to stay in the courtroom at counsel
8  table to help with the presentation of the evidence.
9       Seated at the next table is Mr. Wilkinson, who
10 represents the defendant, seated over there, Christian
11 DeJesus.
12      As Judge Babiarz explained to you, the
13 defendant was charged with an indictment. As he
14 explained, it's just a charging document. And you've
15 already heard the charges against the defendant. But I
16 want to go through them with you so that you understand
17 the charges against him and the evidence that will be
18 presented against him that prove each and every element
19 of all the offenses.
20      The first charge is burglary in the first
21 degree. That Christian DeJesus, the defendant, on or
22 about the 14th day of February 2003, in the County of
23 New Castle, State of Delaware, did at night, knowingly

21

1   and unlawfully, enter or remain in a dwelling located at

2   116 North Scott Street, Wilmington, Delaware, with the

3   intent to commit the crime of unlawful imprisonment

    first degree therein and when, in effecting entry or

5   when in the dwelling, he was armed with a gun, which is

6   a deadly weapon.

7           Count II in the indictment is aggravated

8   menacing. And that alleges the defendant, on the 14th

9   day of February 2003, in the County of New Castle, State

10  of Delaware, did intentionally place Marisol Ayala in

11  fear of imminent physical injury by displaying what

12  appeared to be a deadly weapon, a gun.

13          Count III in the indictment is possession of a

14  firearm during the commission of a felony. That alleges

15  on the same date and time, in the County of New Castle,

16  State of Delaware, the defendant, Christian DeJesus, did

17  possess a gun, a firearm, during the commission of

18  aggravated menacing against Marisol Ayala.

19          Count IV is aggravated menacing. And that

20  alleges that on or about the 14th day of February 2003,

21  in the County of New Castle, State of Delaware, the

22  defendant did place Grace Almodovar, a five-year-old, in

23  fear of imminent physical injury by displaying what

22

1   appeared to be a deadly weapon, a gun.

2           And Count V is possession of a deadly weapon

3   during the commission of a felony. And it alleges that

4   during the crime, the aggravated menacing against the

5   five-year-old, Grace Almodovar, the defendant did

6   possess a firearm, a gun.

7           Count VI in the indictment is again aggravated

8   menacing. And it alleges that on the same date and

9   time, the defendant did intentionally place Solimari

10  Torres, the 15-year-old, in fear of imminent physical

11  injury by displaying what appeared to be a deadly

12  weapon, a gun.

13          Count VII is again possession of a firearm

14  during the commission of a felony. And it alleges that

15  when the defendant committed the crime of aggravated

16  menacing against Solimari Torres that he did possess a

17  gun.

18          Count VIII, which is the second to final charge

    in the indictment, is unlawful imprisonment first

20  degree. That alleges that the defendant, on the 14th

21  day of February 2003, the defendant did knowingly and

22  unlawfully restrain Marisol Ayala under circumstances

23  which exposed her to the threat of serious physical

23

1   injury.

2           Count IX alleges possession of a deadly weapon

3   during the commission of a felony. That when the

4   defendant committed the crime of unlawful imprisonment

5   against Marisol Ayala, he did so with a firearm, a gun.

6           Those are the charges against the defendant

7   which the State intends to prove and will prove to you

8   throughout the trial.

9           There are two types of evidence that the State

10  will present to you. The first is testimony. The

11  witnesses will come into court and up on the witness

12  stand and tell you what happened.

13          You will hear from Marisol Ayala, the mother.

14  And she will tell you about what happened to her and her

15  family. She will testify how scared she was, how

16  terrified she was for the safety of herself and her

17  children. She will testify how she pleaded with the

18  defendant to take her and leave little Grace alone. She

19  will testify how she contacted the police 'cause she was

20  so afraid of what happened.

21          You will also hear from her daughter, Solimari

22  Torres, who is now 17 years old. And she will tell you

23  how, when she saw her little sister with a gun to her

24

1   head, she dropped to the ground. She couldn't move.

2   She will tell you how she was in the kitchen cooking for

3   her family when she heard something going on in the area

4   by the front door. And she will tell you how the

5   defendant ran throughout the house. She will tell you

6   how he pointed the gun at her.

7           And she will tell you that when he left the

8   house, she saw him get into a greenish in color type of

9   car, a Chrysler New Yorker, that she had seen him in

10  before. And she will tell you that when he drove down

11  the street, she heard him firing shots with this gun.

12          You will also hear from Detective Campos with

13  the Wilmington Police Department. And he will tell you,

14  about two weeks after this incident, he stopped the

15  Chrysler New Yorker, this greenish in color car. And he

16  will tell you that the driver of that car was the

17  defendant. And he will tell you that the car was

18  registered to the defendant.

19          And he will tell you how members of the

20  Wilmington Police Department executed a search warrant

21  at this residence. And in that residence, his room was

22  padlocked. And when they went in, there was some --

23  they noticed that the ceiling tiles, that something was

25

1  wrong with them. So they looked beyond those ceiling
2  tiles and found lots of ammunition for a gun. A box of
3  ammunition that normally holds 50, there were only 20,
   and about eight or nine other types of ammunition and
5  bullets. He will tell you that when he interviewed the
6  defendant, the defendant told him that the room in the
7  house that was padlocked was his.
8      That's the evidence against the defendant.
9  That Marisol Ayala and Solimari Torres and little Grace
10 Almodovar were in their house doing what all families
11 do, being together, preparing for dinner, and the
12 defendant came in at gunpoint and held them all there,
13 including little Grace. Thank you.
14     THE COURT: Mr. Wilkinson.
15     MR. WILKINSON: Good afternoon, ladies and
16 gentlemen of the jury. My name is Ralph Wilkinson. I'm
17 representing Christian DeJesus, seated over there at the
18 table.
19     The evidence that is going to be presented
20 today at trial is going to show that Mr. DeJesus did not
21 commit this crime. You're going to hear evidence that
22 Marisol Ayala, the mother in this incident, after this
23 alleged event, wrote two letters stating that she got it

26

1  wrong, that Mr. DeJesus did not commit this crime, and
2  that she did not want an innocent man to be sent to
3  prison for this offense.
4      She wrote a letter -- the evidence is going to
5  show she wrote it directly to Mr. DeJesus. And she
6  wrote another letter in English, and she took the time
7  to get it notarized, too.
8      I ask that you pay close attention to the
9  testimony and particularly during the cross-examination.
10 Because under the cross-examination sometimes the story
11 is going to come out different after it is asked more
12 questions then the State may ask. At the end of this
13 trial, you're going to find Mr. DeJesus did not commit
14 this crime.
15     THE COURT: The State may call its first
16 witness.
17     MS. WOLOSHIN: Yes, Your Honor. Could we just
18 approach, the parties, for scheduling just briefly?
        (Sidebar held off the record.)
20     THE COURT: The witnesses are still waiting
21 down in the attorney general's witness room. They
22 weren't told to come up here until 2:30. So I ask that
23 you go back into the jury room. As soon as the

27

1  witnesses are here, we'll have you come back in.
2      (The jury left the courtroom at 2:21 p.m.)
3      MS. WOLOSHIN: Your Honor, all the other
4  witnesses will be here, so that we don't have any
5  delays. The only other witness that may be a little bit
6  of a problem, but I told them to bring her up at
7  three o'clock, was Solimari Torres, who is down in the
8  juvenile holding cell. I told them to bring her up
9  exactly at three o'clock so that way she would be here
10 when we are ready for her.
11     THE COURT: That's fine. If there's any other
12 witness problem like that, I'm happy to have you address
13 me in open court in front of the jury. Because it
14 doesn't really make any difference; I have to tell them
15 about it anyway.
16     MS. WOLOSHIN: Okay. I'm sorry. Thanks.
17     THE COURT: That's okay. Some judges are
18 different. But I'm happy to let the jury in on our
19 little sidebars.
20     (A short recess was taken.)
21     THE COURT: Bring in the jury.
22     THE BAILIFF: Yes, Your Honor.
23     (Pause.)

*translater for W.*   28

1      (The jury entered the courtroom at 2:32 p.m.)
2      THE COURT: Ms. Woloshin, you may call your
3  first witness.
4      MS. WOLOSHIN: Thank you, Your Honor. The
5  State calls Grace Almodovar.
6      (Pause.)
7      THE COURT: First we need to swear the
8  interpreter.
9      (MARIA PEREZ CHAMBERS was sworn by the clerk of
10 the court to interpret Spanish into English and English
11 into Spanish.)
12     GRACE ALMODOVAR, having been sworn under oath
13 through the interpreter as a witness for the State, was
14 called to the stand and testified as follows:
15     THE COURT: I notice we do have one juror who
16 has an Hispanic name.
17     If there is any member of the jury who
18 understands the Spanish language, you're to be guided by
19 the interpreter as interpretation of the witness
20 testimony and not furnish your own. That's so all
21 jurors may be on the same page.
22     One other thing, Grace's father is present on
23 the stand. The State requested that, and the defense

29

1  agreed that it would be appropriate that her father be
2  nearby just to make her feel comfortable.
3

DIRECT EXAMINATION

5
6  BY MS. WOLOSHIN:
7      Q.  Hi, Grace.
8      A.  **Hi.**
9      Q.  Can you speak into the microphone?  Can you
10  speak loud into the microphone so that everybody can
11  hear you?
12     A.  **Yes.**
13     Q.  Okay.  Can you tell the jury how old you are.
14     A.  **I'm six.**
15     Q.  And what grade are you in in school?
16     A.  **First.**
17     Q.  And who is your teacher?
18     A.  **Ms. Branashaw.**
19     Q.  Do you like school?
20     A.  **Yeah.**
21     Q.  You didn't have to go to school today, did you?
22     A.  **Nope.**
23     Q.  Instead you came here; right?

30

1      A.  **Yep.**
2      Q.  Can you tell the jury what your dad's name is.
3      A.  **Edgardo.**
4      Q.  Edgardo?
5      A.  **Yeah.**
6      Q.  Can you show the jury who he is so that they
7  can all see?  Can you point him out so everyone can see
8  him?
9          (The witness complies.)
10  BY MS. WOLOSHIN:
11     Q.  What color is your shirt?
12     A.  **Pink.**
13     Q.  If I were to tell you that your shirt was
14  green, would that be the truth or a lie?
15     A.  **A lie.**
16     Q.  Is it good to tell a lie or is it bad to tell a
17  lie?
18     A.  **Bad.**
       Q.  And am I a boy or a girl?
20     A.  **A girl.**
21     Q.  Good.  You got that one right.
22          If I were to tell you that I was a boy, would
23  that be the truth or would that be a lie?

31

1      A.  **A lie.**
2      Q.  And is it good to tell a lie or is it bad?
3      A.  **Bad.**
4      Q.  Last year, way long ago when you were in
5  kindergarten, did you live with your mom?
6      A.  **Yeah.**
7      Q.  And how about your sister Solimari, did she
8  live with you, too?
9      A.  **Yes.**
10     Q.  Was there a time that someone came to your
11  house and you were scared?  (Yes?)  Leading –
12     A.  **Yes.**
13     Q.  Can you tell the jury what happened when
14  somebody came to your house and that made you scared?
15     A.  **What, I should be telling these to other**
16  **people?**
17     Q.  Well, pretend you're just telling it to me.
18  Okay?  Tell me what happened when someone came to your
19  house that made you scared.
20     A.  **So can I tell them?**
21     Q.  Yes, you can tell them.
22     A.  **Can I show you with my hand?**
23     Q.  Yes.

32

1          MS. WOLOSHIN:  Let the record reflect that the
2  witness is showing her thumb and her index finger in a
3  pointed position.
4  BY MS. WOLOSHIN:
5      Q.  Can you tell me, 'cause we're just talking, can
6  you tell me what this is (indicating)?
7      A.  **A gun.**
8      Q.  A gun.  And did someone come to your house with
9  a gun?
10         MR. WILKINSON:  Objection, Your Honor.  I think
11  this is rather leading.
12         THE COURT:  Overruled.
13  BY MS. WOLOSHIN:
14     Q.  Did someone come to your house with a gun?
15     A.  **Yes.**
16     Q.  And how did that make you feel when somebody
17  came to your house with a gun?
18     A.  **Sad.**
19     Q.  Who else was there when this person came to
20  your house?
21     A.  **My sister, my mom, and me.**
22     Q.  Was the person that came to your house with a
23  gun, was it a man or a woman?

33

1   A.   A man.

2   Q.   And do you remember what color hair the man

3   had?

    A.   Black.

5   Q.   Was he dark-skinned or was he light-skinned?

6   A.   Dark-skinned.

7   Q.   What did the man do with the gun to you?

8   A.   You mean when he put it on my face?

9   Q.   Is that what he did, Grace?

10  A.   Yes.

11  Q.   Can you show the jury or show me, where on your

12  face did he put the gun?

13  A.   (Indicating).

14  Q.   And when he did that, how did that make you

15  feel?

16  A.   Sad.

17  Q.   Okay.  If I can just have a moment, Your Honor.

18       (Pause.)

19  BY MS. WOLOSHIN:

20  Q.   What's your sister's name?

21  A.   Solimari.

22  Q.   Did Solimari see you with a gun to your head?

23       MR. WILKINSON:  Objection.

34

1        THE WITNESS:  Yes.

2        MR. WILKINSON:  I think it's speculation about

3   someone else.

4        THE COURT:  It's overruled.  It doesn't

5   necessarily call for speculation.

6   BY MS. WOLOSHIN:

7   Q.   Did Solimari see someone put a gun to your

8   head?

9   A.   Yes.

10  Q.   What did she do when she saw that?

11  A.   She was screaming.

12  Q.   What about you, when the gun was put to your

13  head, what -- did you scream?

14  A.   Yes.

15  Q.   Were you sad?  Okay.

16       MS. WOLOSHIN:  Your Honor, at this point I have

17  nothing further.  Thank you.

18       THE COURT:  Mr. Wilkinson.

         MR. WILKINSON:  Just have one second.

20       (Pause.)

21       MR. WILKINSON:  I don't have any questions for

22  this witness.

23       THE COURT:  Okay.

35

1        Grace, you may step down then.  Thank you,

2   Grace.

3        (Pause.)

4        THE COURT:  Ms. Woloshin, you may call your

5   next witness.

6        MS. WOLOSHIN:  Thank you, Your Honor.  The

7   State calls Marisol Ayala.

8        (Pause.)

9        MARISOL AYALA, having been sworn under oath

10  through the interpreter as a witness for the State, was

11  called to the stand and testified as follows:

12

13                 DIRECT EXAMINATION

14

15  BY MS. WOLOSHIN:

16  Q.   Good afternoon, Ms. Ayala.

17  A.   Good afternoon.

18  Q.   Is it okay if I call you Marisol?

19  A.   Yes.

20  Q.   Can you tell the jury where you lived last year

21  in February.  Did you live on Scott Street?

22  A.   Yes.  116 North Scott Street.

23  Q.   And in February of last year, who lived with

36

1   you?

2   A.   Solimari Torres.

3   Q.   Who is Solimari Torres?

4   A.   My daughter, and Grace Marisol, too.

5        THE COURT:  Can the jury hear the interpreter's

6   interpretation?

7        Okay.

8   BY MS. WOLOSHIN:

9   Q.   Is Grace your daughter?

10  A.   Yes.

11  Q.   And while you were living there, do you

12  remember a time that Detective Campos came to your

13  house?

14  A.   Yes.

15  Q.   And did he interview you?

16  A.   Yes.

17  Q.   And what did he interview you about?

18  A.   About an incident that took place at my house.

19  Q.   And when you talked to Detective Campos, did

20  you talk to him voluntarily?

21  A.   Yes.

22  Q.   And what incident did you talk to him about?

23  A.   We were talking about the incident that took

37

1 place at my house when someone came in with a weapon
2 while I was sitting outside smoking. He put the gun on
3 me and asked me to go into the house because he was
  looking for someone else.
5    Q.   Do you remember how the person got to your
6 house?
7    A.   It was a person that was very angry.
8    Q.   Do you know if the person walked to your house
9 or was in a car?
10   A.   In a car.
11   Q.   Do you remember what the car looked like?
12   A.   It was a big green car.
13   Q.   And you said that the person that came to your
14 house was very angry?
15   A.   Yes.
16   Q.   And how did you know this person was angry?
17   A.   Because of his attitude and the way he barged
18 into my house.
19   Q.   While you were outside smoking a cigarette, did
20 this person come over to you to talk to you?
21   A.   Yes.
22   Q.   And this person, was it a man or woman?
23   A.   A man.

38

1    Q.   And what did this man say to you while you were
2 on the porch?
3    A.   He asked where Moreno was.
4    Q.   What did you answer?
5    A.   That he wasn't in the house.
6    Q.   Who was in your house at that time?
7    A.   Solimari, who is my oldest child, and the
8 little one, Grace.
9    Q.   So there was no men in your house at that time?
10   A.   No.
11   Q.   And what did this man do when you told him that
12 this -- when this person Moreno wasn't in your house?
13   A.   He said, yes, he's in there. He grabbed me by
14 the arm and told me to open the door. So I opened the
15 first door to my house into the hallway. And the little
16 one thought that I was playing with her. And she locked
17 the second door. It wasn't until I start knocking when
18 I was crying.
19   Q.   When you say the little one locked the door,
20 who are you talking about?
21   A.   Grace Marie.
22   Q.   And last year how old was Grace?
23   A.   She's six. She'll be seven in June. She was

39

1 five.
2    Q.   And you said that you were crying?
3    A.   Yes.
4    Q.   Why were you crying?
5    A.   He had a gun to my head. The least I could do
6 was cry.
7    Q.   And what happened when you were knocking and
8 crying?
9    A.   So when the little one saw that I was crying
10 and I told her, Please open the door, I'm not playing,
11 she opened the door. But when she opened the door, she
12 hid behind the door. I am thinking he probably thought
13 that that was the person he was looking for. So he
14 yanked the door and he saw her. When she saw him, she
15 did not cry. She didn't scream. She kind of froze.
16   Q.   And so what did he do when he saw Grace?
17   A.   He grabbed her by the arm.
18       Can I go on?
19   Q.   Yes.
20   A.   So he grabbed her by the arm. He pulled out
21 from behind the door and he asked me where Moreno was.
22 I told him, I already told you he's not here. He said,
23 Tell me where he is. And he put the gun on Grace's

40

1 head. And he said, Tell me where he is or I will kill
2 her.
3    Q.   When you saw this person put a gun to Grace's
4 head, what were you thinking?
5    A.   I wasn't thinking. I was screaming. I asked
6 him not to do anything to my girls. I told him to do it
7 to me. But at that time I don't think I was thinking.
8    Q.   And what was Grace doing when the gun went to
9 her head?
10   A.   She had no -- she had no movement. She was in
11 shock.
12   Q.   Then what happened?
13   A.   At that time my oldest one was cooking. And
14 she hadn't really noticed what was going on. But then
15 when I yelled, Let her go; if you're going to do
16 anything, do it to me; you need to let her go; my little
17 one is ill, and he said, All I want is Moreno, my oldest
18 one heard it. And she took one look and then she took a
19 second look. And I don't think she could believe it,
20 'cause she fell to the ground.
21   Q.   When this person was talking to you, the man
22 with the gun, was he speaking in English or in Spanish?
23   A.   He was speaking Spanish.

41

1   Q.   And do both Grace and Solimari understand
2   Spanish?
3   A.   Yes.
    Q.   What happened when Solimari fell to the ground?
5   A.   She was pregnant at the time, so she fell down.
6   I guess she was dizzy.  So when I started screaming,
7   Look what you've done, Look what you've done, She's
8   pregnant, he just left.
9       Right after he left, I went to Solimari and I
10  woke her up.  She woke up.  And when she woke up, she
11  said, Oh, my God.  I asked her if she was okay.  She was
12  okay.  She was where -- and asked for Moreno.  And at
13  that time she tried to leave.  And I held her at home
14  and kept her because I told her she couldn't go out.
15  She was on probation, and it was past nine o'clock.
16  Q.   At some point did you contact the police?
17  A.   Immediately, yes.
18  Q.   And a police officer in uniform came to your
19  house; correct?
20  A.   Yes.
21  Q.   And did you tell this police officer what
22  happened?
23  A.   Yes.

42

1   Q.   Did you talk to Detective Campos that day or
2   did you talk to him some other day?
3   A.   I think it was the following day.  I think it
4   was the next day.  Because I think that day the only
5   people other than the police were the people from
6   Downtown Vision, where my daughter's father works.  And
7   they had heard it on a police radio.  And they showed
8   up.  So I think it was the following day.
9   Q.   Where did Grace's father work last year at that
10  time?
11  A.   For the date when this all happened?
12  Q.   Yes.
13  A.   In Downtown Vision.
14  Q.   And did he come to your house?
15  A.   Yes.
16  Q.   And did you tell him what happened?
17  A.   He had heard some of it over the police radio,
18  because he works with the surveillance cameras.
    Q.   When you spoke to Detective Campos, did you
20  give him anybody's name who you thought came to your
21  house with the gun that night?
22  A.   The name of the person itself, no, because I
23  had only seen this person in the neighborhood a few

43

1   times.  I did say that I thought his name was Chris.
2   Q.   And did you give Detective Campos a description
3   of the car that you saw Chris driving that night when he
4   came to your house?
5   A.   Yes.
6   Q.   And did Detective Campos show you some
7   photographs of some people?
8   A.   Yes.  But it wasn't that day or the day he took
9   down some information.  I think it was a week later.
10  Q.   So about a week later Detective Campos showed
11  you some photographs?
12  A.   Yes.
13  Q.   And in those photographs, did you recognize the
14  person who came to your house with a gun? —
15  A.   Of all the pictures he showed me, all but one
16  of the men were black.  And we pointed to one, and we
17  also showed it to my daughter.  And she picked the same
18  one.  And we said we think it's him.
19  Q.   Okay.  And when you pointed to that picture,
20  what did you tell Detective Campos about that picture?
21  A.   All I said was that.
22  Q.   Did you tell Detective Campos when you pointed
23  to that picture that that was the person who came into

44

1   your house with a gun?
2   A.   Yes.  That it looked like that person, yes.
3       MS. WOLOSHIN:  If I could just have a moment,
4   Your Honor.
5       (Pause.)
6   BY MS. WOLOSHIN:
7   Q.   Is the person that you pointed out to Detective
8   Campos in the photograph, is he in the courtroom?
9   A.   By the picture that I was shown then, which I
10  saw today, I can't say exactly that that's him, but it
11  looks like him.
12  Q.   And Solimari, your daughter, was also shown the
13  same pictures; correct?
14  A.   The day Detective Campos came to our house my
15  oldest daughter was there, and she was shown the
16  picture, and I was there.
17      MS. WOLOSHIN:  Your Honor, may we approach,
18  please?
19      (The following sidebar conference was held.)
20      MS. WOLOSHIN:  Your Honor, at this time the
21  State would move to introduce the photographs that were
22  shown to Marisol Ayala by Detective Campos.  There are
23  six photographs.  I can show them to the Court.  They

45

1  are not mug shots. They were simply Polaroids with the

2  person's name on the back, if the Court would like to

3  see them.

THE COURT: What do you want to do? Do you

5  want to show them to her?

6  MS. WOLOSHIN: Correct.

7  THE COURT: Ask her if those were the

8  photographs she was shown by the police?

9  MS. WOLOSHIN: Correct.

10  THE COURT: Do you have any objection?

11  MR. WILKINSON: No, Your Honor.

12  MS. WOLOSHIN: Okay. Thank you.

13  (The sidebar having concluded, examination

14  continued.)

15  MS. WOLOSHIN: Your Honor, may I have these

16  photographs marked?

17  THE COURT: I gather there's no objection?

18  MR. WILKINSON: Correct.

19  THE COURT: There are six of them?

20  MS. WOLOSHIN: There are six.

21  THE COURT: State's Exhibit 1 through 6.

22  THE CLERK: So marked, Your Honor.

23  (State's Exhibit Nos. 1 through 6 were admitted

46

1  into evidence.)

2  MS. WOLOSHIN: Your Honor, I'm just showing

3  these to defense counsel.

4  (Pause.)

5  MS. WOLOSHIN: May I approach the witness, Your

6  Honor?

7  THE COURT: You may.

8  BY MS. WOLOSHIN:

9  Q.  Ms. Ayala, I'm showing you what has been marked

10  as State's Exhibit 1 through 6. I'm going to ask you to

11  take a look at them.

12  (Pause.)

13  BY MS. WOLOSHIN:

14  Q.  Right now all I want you to do is look at them.

15  Okay?

16  Are those the photographs that Detective Campos

17  showed you?

18  A.  I think so.   Not sure

Q.  Thank you.

20  When you looked at the photographs with

21  Detective Campos, did you do that voluntarily?

22  A.  I don't understand the question.

23  Q.  Did Detective Campos force you to look at the

47

1  photographs or did you do so --

2  **A.  No, he didn't force me.**

3  Q.  And can you explain to the jury what the

4  purpose of you looking at those photographs was?

5  **A.  He told me that he had some pictures of people**

6  **who had been detained. And he asked me if I recognized**

7  **anyone on those pictures or if anyone in those pictures**

8  **looked like the person that came into my house.**

9  Q.  And you said that there was one photograph that

10  you pointed out to Detective Campos?

11  **A.  Yes.**

12  MS. WOLOSHIN: Your Honor, if I can approach

13  the witness again.

14  BY MS. WOLOSHIN:

15  Q.  I'm going to hand you the photographs back.

16  And if you could, look at those photographs and pull out

17  the one that you pointed to with Detective Campos.

18  **A.  It was this one (indicating).**

19  Q.  Just so that we're clear, the one on top?

20  **A.  Yes.**

21  Q.  So that it's clear, can you separate that from

22  the rest of them.

23  THE COURT: What's the number on the back?

48

1  THE WITNESS: No. 3.

2  MS. WOLOSHIN: Okay. Thank you.

3  For the record, it's State's Exhibit No. 3.

4  Your Honor, with leave of the Court, may I

5  publish this to the jury?

6  THE COURT: You may do so.

7  MS. WOLOSHIN: I'm showing the jury State's

8  Exhibit No. 3.

9  (Pause.)

10  MS. WOLOSHIN: Thank you, Ms. Ayala. I have

11  nothing further at this time.

12  THE COURT: Mr. Wilkinson.

13  MR. WILKINSON: Just have a moment to...

14  (Pause.)

15

16  CROSS-EXAMINATION

17

18  BY MR. WILKINSON:

19  Q.  Good afternoon. May I call you Marisol?

20  A.  Yes.

21  Q.  The photographs, you were asked awhile ago

22  whether those were the same photographs you looked at

23  awhile back, about a year ago. And you said, I think

49

1   so.

2        Is it true you really don't have a recollection

3   of what photos you looked at? Correct? You can't say

4   for certain those are the same photographs; correct?

5        A.   I would say they are the same.

6        Q.   And did you state previously that you thought

7   five of the photographs were of African American men and

8   one was an Hispanic man?

9        A.   To me they were black and one Hispanic.

10       Q.   Okay. You actually knew Christian DeJesus

11  prior to February 13th, 2003; correct?

12       A.   I knew him -- I had seen him. I know that he

13  has either a cousin or a brother that looks very much

14  like him. And I don't know which one it is because I

15  really haven't talked to him. And I've seen them both

16  together.

17       Q.   And the two of them look very much alike?

18       A.   Yes.

19       Q.   And you don't really know whether it was

20  Christian DeJesus who went in your house on

21  February 13th, do you?

22       A.   I am not absolutely sure. I couldn't say that

23  it was definitely him.

50

1        Q.   And it's true, isn't it not, that you wrote a

2   letter to Christian DeJesus?

3        A.   Yes.

4        Q.   And in that letter, isn't it true that you

5   apologized to Christian for accusing him of this crime?

6        A.   Yes.

7        Q.   And you had another letter that you had a

8   friend write; correct?

9        A.   Exactly.

10       Q.   Pertaining to this matter?

11       A.   A letter that I had notarized.

12       Q.   And you signed the letter; correct?

13       A.   Yes.

14       Q.   And you're aware of the contents of the letter;

15  correct?

16       A.   Yes.

17       MR. WILKINSON: If I could have these marked as

18  a defense exhibit.

19       MS. WOLOSHIN: No objection.

20       THE COURT: Is that two documents or one?

21       MR. WILKINSON: There's two documents. I'm

22  sorry.

23       THE COURT: Okay. That will be Defendant's 1

51

1   and 2.

2        THE CLERK: So marked, Your Honor.

3        (Defendant's Exhibit Nos. 1 and 2 were admitted

4   into evidence.)

5        (Pause.)

6        MR. WILKINSON: If I could approach the

7   witness, Your Honor?

8        THE COURT: You may.

9   BY MR. WILKINSON:

10       Q.   Do you see the letter that's sitting in front

11  of you?

12       A.   Do you want me to just look at it or read it?

13       Q.   Do you recognize that letter?

14       A.   Yes.

15       Q.   And that is your handwriting; correct?

16       A.   Yes.

17       Q.   And you wrote that letter and mailed it to

18  Christian DeJesus; correct?

19       A.   Yes.

20       Q.   And do you remember when you mailed it?

21       A.   This is not the one that I had notarized; but

22  this is my handwriting, and I did write this letter.

23       Q.   Okay. And do you remember when you wrote the

52

1   letter?

2        A.   I don't remember.

3        Q.   Was it about a year ago?

4        A.   No, not that long.

5        Q.   About nine months ago?

6        A.   No.

7        Q.   Was it about six months ago?

8        A.   No.

9        Q.   Was it within the last three months?

10       A.   Yes.

11       Q.   So it was about three months ago?

12       A.   Um-hmm.

13       Q.   And could you please read the letter.

14       A.   "Hello, Christian. How are you? I'm fine. I

15  hope that when you get this short lines you are well. I

16  am writing to tell you that I am very sorry that you're

17  in there being innocent. But I will go see you. And I

18  will also go to court the day of your hearing to tell

19  the truth that you are not the person that they are

20  looking for and that I do not remember the person. So

21  do not worry. You are innocent and you will be out

22  soon. I promise. I am going to make an appointment to

23  go to see you. Okay? May God bless you. I love you.

53

1  Marisol."

2      Q.  And you wrote another letter on behalf of

3  Christian DeJesus; correct?  You wrote a second

    notarized letter?

5      A.  That's correct.

6      Q.  And --

7      A.  But it wasn't for him.

8      Q.  But it was on his behalf; correct?

9      A.  Um-hmm.

10     Q.  And you took the time to get it notarized, too?

11     A.  That's correct.

12     Q.  And you took the time to get it notarized

13  because what was in the letter was the truth?

14     A.  Proof of what?

15     Q.  No.  That the contents of the letter are true?

16     A.  That's correct.

17     Q.  Okay.

18         MR. WILKINSON:  If I could approach the

19  witness?

20         THE COURT:  You may.

21         The first letter is what one?

22         MR. WILKINSON:  First letter is Exhibit 1.

23  This is Exhibit 2.

54

1          (Pause.)

2  BY MR. WILKINSON:

3      Q.  Do you read English, ma'am?

4      A.  A little.

5      Q.  Are you able to read the letter?

6      A.  Yes.

7      Q.  Would you please read the letter to the jury

8  that you wrote to Christian.

9          (The following answer is not through the

10  interpreter.)

11         THE WITNESS:  To who it may concern.  My name

12  is Marisol Ayala.  And I am -- this man was not the man

13  to my house --

14         THE COURT REPORTER:  I can't understand.

15         THE INTERPRETER:  The court reporter can't

16  understand.

17  BY MR. WILKINSON:

18     Q.  It may be a little bit easier to do it this

19  way.  Did you write, "I don't want an innocent man to be

20  put in jail.  Please forgive me for this mistake."

21     A.  Um-hmm.

22     Q.  When was the last time that you spoke to the

23  detective seated over here, Detective Campos?

55

1      A.  I think maybe two weeks ago, maybe less than

2  two weeks ago on the phone.

3      Q.  Did he tell you that unless you came in to

4  testify against Christian DeJesus that you'd be

5  arrested?

6      A.  That if I didn't come and testify?

7      Q.  Correct.  That if you did not come and testify,

8  that you'd be arrested?

9      A.  I was arrested.  I spent a night in jail.

10     Q.  My question was:  Was there an earlier point in

11  time that Detective Campos said you would be arrested

12  unless you came in and testified against Christian

13  DeJesus?

14     A.  Not to me, to my mother.

15     Q.  And your mother conveyed that message to you?

16     A.  Yes, she did tell me.

17         MR. WILKINSON:  If I could just have one

18  moment.

19         (Pause.)

20         MR. WILKINSON:  That concludes my questioning

21  for now.

22         THE COURT:  Ms. Woloshin.

23         MS. WOLOSHIN:  Thank you, Your Honor.

56

1          MS. WOLOSHIN:  May I approach the witness, Your

2  Honor?

3          THE COURT:  You may.

4

5              REDIRECT EXAMINATION

6

7  BY MS. WOLOSHIN:

8      Q.  Ms. Ayala, I'm handing you what is State's

9  Exhibits No. 2 and No. 5.  Do those look like pictures

10  of black men or Hispanic men?

11     A.  No. 2 is black.  You said No. 2?

12     Q.  I asked you to look at Nos. 2 and 5.

13     A.  No. 2 is black.  But I think No. 5 could be

14  Hispanic.

15     Q.  And these were the pictures that Detective

16  Campos showed you; correct?

17     A.  I think so.

18     Q.  Okay.

19         MR. WILKINSON:  Let me see those.

20         MS. WOLOSHIN:  Sure.

21  BY MS. WOLOSHIN:

22     Q.  You told -- or can you tell this jury how you

23  felt when a man you identified as Chris and pointed out

57

1  in a photograph to Detective Campos came to your house
2  and held a gun to your head and Grace's, how did you
3  feel?

   A.  **At the time of the incident?**
5  Q.  Yes.
6  A.  **Well, at the time when he had the gun on my**
7  **little girl, I was nervous and I was scared.**
8  Q.  Okay.  Do you feel that way today?
9  A.  **No.**
10 Q.  Did you feel that way when you wrote the
11 letters?
12 A.  **No.**
13 Q.  Do you feel that way about the man that put a
14 gun to your little girl's head?
15 A.  **I don't understand.**
16 Q.  Are you afraid of the man that put a gun to
17 your head and to Grace's?
18 A.  **If I run into him straight on or if he comes**
19 **back into my house, I would be scared.**
20 Q.  But how about being in the same room with him,
21 would you be afraid?
22 A.  **In the same what?**
23 Q.  Room.

58

1  A.  **Well, of course.**
2  Q.  Are you afraid that the person that put a gun
3  to your head and to Grace's will come back?
4  MR. WILKINSON:  Objection.  Relevancy.
5  THE COURT:  Overruled.
6  THE WITNESS:  It worries me.
7  BY MS. WOLOSHIN:
8  Q.  Are you afraid?
9  A.  **Yes.**
10 MS. WOLOSHIN:  I have nothing further.
11 THE COURT:  Mr. Wilkinson, anything else?
12 MR. WILKINSON:  Just real quick.
13
14 RECROSS-EXAMINATION
15
16 BY MR. WILKINSON:
17 Q.  You did testify just a couple moments ago that
18 if you were in the same room as the man you would be
   scared; correct?
20 A.  **Well, of course.**
21 Q.  Of course.  You're not scared now; correct?
22 A.  **I am not afraid right now.**
23 MR. WILKINSON:  No further questions.

59

1  THE COURT:  Ms. Woloshin?
2  MS. WOLOSHIN:  Nothing further.  Thank you.
3  THE COURT:  Very well.  The witness may step
4  down.
5  Ms. Woloshin, the State may call its next
6  witness.
7  MS. WOLOSHIN:  Thank you.  The State will call
8  Solimari Torres.
9  (Pause.)
10 SOLIMARI TORRES, having been sworn under oath
11 as a witness for the State, was called to the stand and
12 testified as follows:
13
14 DIRECT EXAMINATION
15
16 BY MS. WOLOSHIN:
17 Q.  Good afternoon, Solimari.
18 A.  **Hi.**
19 Q.  I'm going to ask, so that everyone can hear
20 you, if you can pull the microphone closer to you so
21 that everyone over here can hear you.  Okay?
22 A.  **Yes.**
23 Q.  Can you tell the jury how old you are.

60

1  A.  **Seventeen.**
2  Q.  And can you tell the jury, do you have any
3  brothers or sisters?
4  A.  **Yes.  I have a six-year-old sister.**
5  THE COURT:  Pull that microphone a little bit
6  closer to you.
7  THE WITNESS:  I have a six-year-old sister.
8  BY MS. WOLOSHIN:
9  Q.  What's her name?
10 A.  **Grace Marie Ayala.**
11 Q.  What is your mother's name?
12 A.  **Marisol Ayala.**
13 Q.  Last year in February, around Valentine's Day,
14 were you living with your mom and your sister?
15 A.  **Yes.**
16 Q.  And do you remember where you were living at
17 that time?
18 A.  **Yes.**
19 Q.  Where?
20 A.  **116 North Scott Street.**
21 Q.  And do you remember talking to Detective Campos
22 last year?
23 A.  **Yes.**

61

1    Q.  And do you remember why you talked to him,

2    about what?

3    A.  **About an incident that occurred at my house.**

4    Q.  And can you tell the jury about the incident

5    that happened in your house that you spoke to Detective

6    Campos about.  Can you tell the jury what happened at

7    your house.

8    A.  **A man came in with a gun in my house.**

9    Q.  And were you in the house at that time when the

10   man came in with a gun?

11   A.  **Yes.**

12   Q.  Where were you in the house?

13   A.  **I was in the kitchen.**

14   Q.  And what were you doing in the kitchen?

15   A.  **I was cooking something.**

16   Q.  And who else was in the house when the man came

17   in with a gun?

18   A.  **My sister.**

19   Q.  Grace?

20   A.  **Um-hmm.**

21   Q.  And how about your mom?

22   A.  **She was outside.  She came in.**

23   Q.  Do you know why she came in?

62

1    A.  **Because the man forced her in.**

2    Q.  How did he force her in?

3    A.  **With a gun.**

4    Q.  As best as you can -- I know this is hard.  If

5    you could keep your voice up, Solimari.

6    A.  **Yes.**

7    Q.  Did you see the man with the gun do anything

8    with the gun to your mom?

9    A.  At the time, I just passed out.

10   Q.  I'm sorry?

11   A.  **At that time, I just passed out.**

12   Q.  Okay.  Did the man do anything to Grace with

13   the gun?

14   A.  **Yes.**

15   Q.  What did he do?

16   A.  **He put the gun to my sister's head.**

17   Q.  Did he do anything with the gun to you?

18   A.  **No.**

19   Q.  Do you remember or?

20   A.  **No.**

21   Q.  Why did you pass out?

22   A.  **I don't know.  I was pregnant at that time.**

23   Q.  But what --

63

1    A.  **I didn't pass out.  I just couldn't -- then I**

2    **started running out of the house.**

3    Q.  But was there something that you or that you

4    saw that caused you to fall down?

5    A.  **I guess seeing my sister so scared.**

6    Q.  Your sister so scared.  And why was your sister

7    so scared?

8    A.  **Because she was grabbed.**

9    Q.  By the man with the gun?

10   A.  **Yes.**

11   Q.  Did the man with the gun point the gun at your

12   mom?

13   A.  **I can't remember.**

14   Q.  When you talked to Detective Campos, did you

15   tell him about what had happened to you, what had

16   happened during this time when the man came into your

17   house with the gun?

18   A.  **Yes.**

19   Q.  And when you talked to him, did you talk to him

20   voluntarily or did he force you to talk to him?

21   A.  **Voluntary.**

22   Q.  You said that you ran out of the house?

23   A.  **Yes.**

64

1    Q.  Did you see -- when you ran out of the house,

2    did you see the man with the gun go anywhere, get in a

3    car, walk away?

4    A.  **He was trying to call me, but I kept**

5    **on running.  But he got in the car.**

6    Q.  When you say "he got in the car," when you say

7    he was trying to call you, do you mean on a phone or out

8    loud?

9    A.  **Out loud.**

10   Q.  Screaming your name?

11   A.  **No, not my name.**

12   Q.  What?

13   A.  **He said, Come back over here.**

14   Q.  Were you in front when you were running out of

15   the house or was he in front?  Do you understand the

16   question?

17   A.  **In front of the house?**

18   Q.  No.  I mean, who left the house first, was it

19   you or the man with the gun?

20   A.  **I did.**

21   Q.  And why did you run out of the house?

22   A.  **'Cause I was scared.**

23   Q.  Why were you scared?

65

1    A.   I didn't want nothing to happen to me. I was

2    pregnant.

3        Q.   And the man had a gun; right?

     A.   Um-hmm.

5        Q.   So you ran out of the house. Did he come after

6    you out of the house?

7        A.   I just started running.

8        Q.   And he was behind you calling you?

9        A.   No. He just called me and then left in the

10   car.

11       Q.   And when you say he called you, what did he

12   say?

13       A.   "Come back over here."

14       Q.   And what did you do?

15       A.   I left.

16       Q.   To get away?

17       A.   Um-hmm.

18       Q.   And you said you saw him get in a car?

19       A.   Yes.

20       Q.   Do you remember what the car looked like?

21       A.   It was blue.

22            MS. WOLOSHIN: Your Honor, I think, without

23   objection, the State offers the next photograph into

66

1    evidence.

2            THE COURT: No objection?

3            MR. WILKINSON: That's correct, no objection.

4            THE COURT: That will be the next State's

5    exhibit.

6            THE CLERK: So marked State's Exhibit 7.

7            (State's Exhibit No. 7 was admitted into

8    evidence.)

9            MS. WOLOSHIN: Your Honor, may I approach the

10   witness?

11           THE COURT: You may.

12   BY MS. WOLOSHIN:

13       Q.   Solimari, I'm handing you a photograph which is

14   State's Exhibit No. 7. Can you tell the jury what that

15   photograph is of?

16       A.   That's his car.

17       Q.   Okay. Whose car?

18       A.   The guy that went in my house.

19       Q.   And is that the car -- does that photograph

20   accurately depict the car that the man with the gun got

21   into that night?

22       A.   Yes.

23       Q.   Did you tell Detective Campos a name or a

67

1    nickname of the person that you thought it was that came

2    into your house with gun?

3        A.   Yes, I did.

4        Q.   And what name did you give him?

5        A.   I heard around the block he was called --

6            MR. WILKINSON: Objection. I think she's

7    getting ready to give hearsay testimony.

8            THE COURT: Why don't you ask a different

9    question. Clarify just the source of her knowledge.

10           MS. WOLOSHIN: Okay.

11   BY MS. WOLOSHIN:

12       Q.   Did you personally know this person's nickname?

13       A.   No.

14       Q.   You heard it from someplace else?

15       A.   Yes.

16       Q.   And did you provide that nickname to Detective

17   Campos?

18       A.   Yes.

19       Q.   And what nickname did you give Detective

20   Campos?

21       A.   Christian.

22       Q.   Can you spell that for the court reporter and

23   the jury.

68

1        A.   C-H-R-I-S-T-I-A-N.

2        Q.   And did you give Detective Campos a description

3    of the car?

4        A.   Yes, I did.

5        Q.   And did Detective Campos show you some

6    photographs of people to look at?

7        A.   Yes.

8        Q.   And what was the purpose of you looking at the

9    photographs?

10       A.   He came to my house one day and showed me some

11   pictures, and I picked out the pictures.

12       Q.   He asked you to look at the photographs for

13   what reason?

14       A.   To pick the person who was...

15       Q.   To pick what?

16       A.   He showed me the pictures of different people,

17   and I picked out the person.

18       Q.   The person that did what?

19       A.   That went in my house.

20           MS. WOLOSHIN: Your Honor, may I approach the

21   witness? Thank you.

22   BY MS. WOLOSHIN:

23       Q.   Solimari, I'm handing you, although they're out

69

1  of order now, some photographs that have already been
2  marked State's Exhibit 1 through 6. Can you just take a
3  look at those.
   (Pause.)
5  THE WITNESS: What do you want me to do?
6  BY MS. WOLOSHIN:
7  Q.  Just look at them for now. Are those the
8  photographs that Detective Campos showed you when he
9  came to your house?
10  A.  I can't remember.
11  Q.  I'm sorry. They were all what?
12  A.  I can't remember if these were all the pictures
13  he showed me.
14  Q.  Okay. Is the person that you picked out and
15  showed to Detective Campos, is he in the group of
16  photographs?
17  A.  Yes.
18  Q.  Can you pull that one separate from all the
19  others and tell -- look on the back and tell me what
20  number that's marked as?
21  A.  No. 3.
22  Q.  Okay. And looking at that photograph, is that
23  the person that came into your house and put a gun to

70

1  your sister Grace's head?
2  A.  Yes.
3  Q.  The person that's in that photograph, is he in
4  the courtroom today?
5  A.  Yes.
6  Q.  Can you point him out for me?
7  A.  He's sitting with a suit (indicating).
8  Q.  There are two men over here with a suit. Is it
9  this one or is it this one (indicating)?
10  A.  On your right.
11  Q.  This one (indicating). This is the man that
12  came into your house and put a gun to Grace's head?
13  A.  Yes.
14  Q.  After he came to your house that night, did you
15  see him after that?
16  A.  Yes. I saw him a couple times.
17  Q.  Did he ever come up and talk to you?
18  A.  Yes. He came and talked to me about -- he
       showed me his daughter's pictures and told me that he
20  has a daughter and that he feel bad for what he did.
21  Q.  And did he say anything else?
22  A.  That he felt bad.
23  Q.  And when he said that he felt bad for what he

71

1  did, do you know what he was talking about, what he was
2  referring to?
3  A.  He was drunk that night.
4  Q.  What night?
5  A.  That it happened, the incident.
6  Q.  And that he was saying that he felt bad about
7  that night?
8  A.  Um-hmm.
9  Q.  When you saw him get into the car the night of
10  the incident, did you see him drive away?
11  A.  I just started running.
12  Q.  Did you hear anything come from his car?
13  A.  When I got to the restaurant down the street
14  from my house.
15  Q.  What did you hear?
16  A.  Where I called the police from. I heard some
17  gunshots, but I'm not sure.
18  Q.  Okay.
19  MS. WOLOSHIN: If I can just have a moment,
20  Your Honor.
21  (Pause.)
22  MS. WOLOSHIN: Your Honor, thank you. I have
23  nothing further.

72

1  THE COURT: Mr. Wilkinson.
2
3  CROSS-EXAMINATION
4
5  BY MR. WILKINSON:
6  Q.  Good afternoon, Solimari.
7  You said that on February 13th that you felt
8  faint or dizzy and fell down?
9  A.  I just felt dizzy, like I felt like I was going
10  to pass out.
11  Q.  How long -- did you fall down on the floor?
12  A.  No. No. Everything went --
13  Q.  You felt dizzy but you stayed standing the
14  whole time?
15  A.  Yes.
16  Q.  When the officer showed you the photos, when he
17  showed you the photo line-up, he only showed you six
18  photos; correct?
19  A.  I can't remember.
20  Q.  Do you remember if he showed you more than ten
21  photos?
22  A.  No, he didn't show me more than ten.
23  Q.  So it was just a few photos. Then it was less

73

1  than ten photos that he showed you; correct?
2     A.  **I guess so.**
3     Q.  And your mother, was she right next to you when
   you were looking at the photos?
5     A.  **No.**
6     Q.  Was she in the room with you?
7     A.  **No.  He showed us pictures in separate rooms.**
8     Q.  You stated that you -- alleged a little bit
9  earlier that you saw Christian DeJesus after the
10 incident?
11    A.  **Yes.**
12    Q.  You alleged that he had been drinking and you
13 were talking to him?
14    A.  **I was talking to him?**
15    Q.  Yeah.  You stated that you were having a
16 regular conversation with Christian DeJesus after this
17 incident --
18    A.  **Yes.**
19    Q.  -- this alleged incident?
20    A.  **He came up to me and talked to me.**
21    Q.  Where was that at?
22    A.  **On Third.**
23    Q.  On Third Street?

74

1     A.  **Um-hmm.**
2     Q.  How long did you allegedly speak to him?
3     A.  **I'd say about ten minutes.**
4     Q.  So you spoke to him for about ten minutes?
5     A.  **Um-hmm.**
6     Q.  And did you see him walking up to you on Third
7  Street?
8     A.  **I was going by.  He stopped and showed me his
9  daughter's picture.**
10    Q.  Okay.  Basically, you just had a regular
11 conversation with him; correct?
12    A.  **Um-hmm.**
13    Q.  And you went on your way after that; correct?
14    A.  **Yes, I did.**
15    Q.  And you never went to the police, did you?
16    A.  **To the police?**
17    Q.  After you allegedly spoke to Christian, you
18 never went to the police; correct, on Third Street?
   When you spoke to him on Third Street and you had your
20 conversation, you went on your way and never contacted
21 the police after that; correct?
22    A.  **No.**
23    Q.  Is it true that just a couple years ago, in

75

1  2002, that you were convicted in a -- or found
2  delinquent in family court for possession with intent to
3  deliver cocaine?
4     A.  **Yes, I did.**
5     Q.  You were also found delinquent to conspiracy
6  second related to the possession with intent to deliver
7  cocaine?
8     A.  **Yes.**
9        MR. WILKINSON:  No further questions.
10       THE COURT:  Ms. Woloshin.
11
12            REDIRECT EXAMINATION
13
14 BY MS. WOLOSHIN:
15    Q.  Solimari, regarding those charges, you actually
16 pled guilty; correct?
17    A.  **Yes, I did.**
18    Q.  Do you know why the defendant came up and
19 talked to you on Third Street?  Did he tell you why?
20    A.  **Because he felt bad.**
21    Q.  And how do you feel sitting in this courtroom
22 right now?
23    A.  **A little bit nervous.**

76

1     Q.  And how did you feel the night that the
2  defendant over there came into your house with a gun?
3     A.  **Scared.**
4     Q.  And how do you feel being in the courtroom
5  today with him in the same courtroom?
6     A.  **Nervous.**
7        MS. WOLOSHIN:  I have nothing further.
8        THE COURT:  Mr. Wilkinson, anything else?
9        MR. WILKINSON:  One second, Your Honor.
10       (Pause.)
11       MR. WILKINSON:  No further questions.
12       THE COURT:  All right, Ms. Torres.  You may now
13 step down.  Thank you.
14       MS. WOLOSHIN:  Your Honor, may I just have a
15 moment with the bailiff?
16       (Pause.)
17       THE COURT:  You may call your next witness.
18       MS. WOLOSHIN:  Thank you.  The State calls
19 Detective Campos.
20       WILFREDO CAMPOS, having been sworn under oath
21 as a witness for the State, was called to the stand and
22 testified as follows:
23

77

DIRECT EXAMINATION

1
2

3    BY MS. WOLOSHIN:

Q.    Good afternoon, Detective Campos.

5    A.    Good afternoon.

6    Q.    Can you tell the jury how long you've worked

7    for the Wilmington Police Department.

8    A.    Since September 30th, 1996.

9    Q.    And can you tell the jury what division,

10    department are you currently in at the Wilmington Police

11    Department.

12    A.    I'm currently assigned to the criminal

13    investigation division.

14    Q.    What does that mean?

15    A.    I'm assigned to investigate robberies,

16    burglaries, any type of crimes that occur in the city of

17    Wilmington.

18    Q.    And the criminal investigations unit is often

19    referred to as the detectives unit?

20    A.    Yes.

21    Q.    And how long have you been in the detectives

22    unit?

23    A.    I've been in the detectives unit since

78

1    April 2001.

2    Q.    And were you assigned to investigate the case

3    that we're here about today?

4    A.    Yes.

5    Q.    And do you remember when you got involved in

6    the case?

7    A.    I got involved, I believe it was -- check my

8    report -- shortly afterwards. The 20th of February is

9    when I first had my initial contact with the victims.

10    Q.    And when you're talking about the victims, who

11    are you referring to?

12    A.    I am referring to Marisol Ayala, Grace

13    Almodovar, and Solimari Torres.

14    Q.    Do you speak Spanish?

15    A.    Yes, I do.

16    Q.    Are you fluent in Spanish?

17    A.    Yes.

18    Q.    Did that help you when you were investigating

this case, since some of the witnesses speak Spanish?

20    A.    Yes.

21    Q.    When was the first time you met Marisol Ayala?

22    A.    The first time I spoke to Marisol Ayala was on

23    February 20th, 2003.

79

1    Q.    And did you go to her house? Did she come to

2    the police station?

3    A.    Yes. I went to her house.

4    Q.    And can you describe for the jury her level of

5    cooperation with your investigation.

6    A.    At that time?

7    Q.    Yes.

8    A.    At that time she was cooperating. She

9    basically explained to me what happened that night.

10    Q.    And did she provide you any nicknames?

11    A.    She told me she thought the guy's name was

12    Chris.

13    Q.    And at that same time did you speak with

14    Solimari Torres, her daughter?

15    A.    I did.

16    Q.    And can you describe her level of cooperation

17    at that time.

18    A.    She told me also what happened that night.

19    Q.    So she was cooperative?

20    A.    Yes.

21    Q.    During your investigation, did you ever

22    interview Grace Almodovar?

23    A.    No, I didn't.

80

1    Q.    Is that because she's so young?

2    A.    Yes. And also because of her mother said she

3    was having nightmares about the incident, and she

4    wouldn't like me to interview her at the time. It was

5    her request.

6    Q.    Okay. And your investigation of this case went

7    from February 20th until when?

8    A.    I believe about a month later, about March 6th.

9    Q.    On March 6th, based upon your investigation,

10    did you stop a certain vehicle?

11    A.    Yes, I did.

12    Q.    And what vehicle was that?

13    A.    It was a 1996 Chrysler New Yorker.

14    Q.    And when you stopped the car, you were acting

15    as a police officer, obviously?

16    A.    Yes.

17    Q.    And do you recall who was driving that vehicle?

18    A.    Christian DeJesus.

19    Q.    And is Christian DeJesus in this courtroom

20    today?

21    A.    Yes, he is.

22    Q.    Can you point him out for the members of the

23    jury.

81

1    A.    He is seated at defense table in the gray suit

2    with the white shirt.

3    Q.    Since there are two people over here in suits,

is he on the left or is he on the right?

5    A.    To your right.

6    Q.    So this one (indicating)?

7    A.    Right.

8    Q.    That's Christian DeJesus?

9    A.    Yes.

10    Q.    And he was the driver of the Chrysler New

11    Yorker?

12    A.    Yes, he was.

13          MS. WOLOSHIN:  May I approach the witness, Your

14    Honor?

15          THE COURT:  You may.

16    BY MS. WOLOSHIN:

17    Q.    Detective Campos, I'm handing you what is

18    State's Exhibit 7.  Can you tell the jury what that

19    photograph depicts?

20    A.    That is the vehicle I stopped on March 6th with

21    Christian DeJesus as the driver.

22    Q.    Was that car ever described to you by either

23    Marisol Ayala or Solimari Torres?

82

1    A.    Yes.

2    Q.    By which one or --

3    A.    Solimari Torres described the vehicle.

4          MS. WOLOSHIN:  Your Honor, may I publish this

5    photograph to the jury?

6          THE COURT:  Yes.

7          MS. WOLOSHIN:  Thank you.

8          (Pause.)

9    BY MS. WOLOSHIN:

10    Q.    So on March 6th, 2003, you stopped this vehicle

11    and the defendant was the driver of that car?

12    A.    Yes, ma'am.

13    Q.    Did you conduct or did you execute any search

14    warrants with regard to this case?

15    A.    Yes.

16    Q.    And when was that search warrant executed?

17    A.    That was executed on March 6th, I believe.

18    Yes.  March 6th of 2003.

19    Q.    And what was the address of the residence that

20    you executed the search warrant on?

21    A.    1702 West Third Street.

22    Q.    And was there a specific room that you

23    searched?

83

1    A.    Yes.  I searched the -- actually, the entire

2    house.  The defendant's bedroom was a second-floor

3    bedroom that he described towards the front of the home.

4    Q.    Okay.  And just so that we're clear, I only

5    want to discuss what you found in the defendant's room.

6    A.    Correct.

7    Q.    And was there any type of lock that was on that

8    door?

9    A.    Yeah.  There was a padlock.  And we had to

10    force the door open to gain entry into it.

11    Q.    And did you find anything in that room?

12    A.    Yes, I did.

13    Q.    And did it relate to this case?

14    A.    Yes.

15    Q.    The case you were investigating?

16    A.    Yes.

17    Q.    And what did you find?

18    A.    I found several different type of ammunitions

19    for a handgun.

20          (Pause.)

21          MS. WOLOSHIN:  Just for the record, with the

22    Court's permission, I'm showing defense counsel what is

23    proposed as the next State's exhibit.

84

1          MR. WILKINSON:  I don't object.

2          MS. WOLOSHIN:  Your Honor, at this time the

3    State moves into evidence, I guess, three different

4    packages of evidence.  I don't know if you --

5          THE COURT:  When it gets in, will there be any

6    objection?  I know you haven't heard the witness testify

7    that that's what he found, but --

8          MR. WILKINSON:  I'm sorry, Your Honor.  Is

9    there going to be any objection as having that admitted

10    as evidence?

11          THE COURT:  Yes.

12          MR. WILKINSON:  No.  There's no objection.

13          MS. WOLOSHIN:  Does the Court want to mark this

14    as one exhibit with different -- because it's all in the

15    same packages -- with A, B, and C?

16          THE COURT:  Unless you're going to refer to

17    each item separately, we can mark it as joint.  If

18    you're going to do it each individual item, we'll do it

19    separately.

20          MS. WOLOSHIN:  Okay.  Then I'll do it

21    separately.

22          (Pause.)

23          THE CLERK:  So marked State's Exhibit 8, 9, and

85

1    10.

2        (State's Exhibit Nos. 8, 9, and 10 were

3    admitted into evidence.)

         MS. WOLOSHIN:  May I approach the witness?

5        THE COURT:  You may.

6        MS. WOLOSHIN:  Thank you.

7    BY MS. WOLOSHIN:

8        Q.   Detective Campos, I'm handing you what is

9    State's Exhibit 8, 9, and 10.  And specifically

10   referring to the envelope first, there's a green tag on

11   that envelope; is that correct?

12       A.   Yes.

13       Q.   Can you tell and explain to the jury what the

14   purpose of that green tag is.

15       A.   **This is the purpose of recording our evidence**

16   **that we recover that we submit to our records division.**

17       Q.   And in the Wilmington Police Department; is

18   that correct?

19       A.   **Yes.**

20       Q.   And all exhibits were in that envelope when you

21   brought it to court today; correct?

22       A.   **Yes.**

23       Q.   And the green tag, is that filled out in your

86

1    handwriting?

2        A.   **Yes, it is.**

3        Q.   And can you explain to the jury what it says on

4    that evidence tag.

5        A.   **Read from top to bottom?**

6        Q.   Just the identifying information.

7        A.   **It says, 150-count box of American Eagle 9**

8    **millimeter rounds which contained 20 rounds; three**

9    **.38-caliber special Winchester rounds; three .38-caliber**

10   **special normal rounds; and one clear --**

11       Q.   Let's --

12       A.   **One Pep Boys receipt with customer's name of**

13   **Christian DeJesus.**

14       Q.   Is there a person's name on the front of that

15   green tag?

16       A.   **Yes, there is.**

17       Q.   What name is that?

18       A.   **Christian DeJesus.**

19       Q.   And that's to record the items where you found

20   it?

21       A.   **Yes.**

22       Q.   And in his room?

23       A.   **Yes.**

87

1        Q.   Can you describe where you found those items in

2    the defendant's room.

3        A.   **They were found in -- the ceiling tiles, some**

4    **of them were missing.  Some of them were pulled back.  I**

5    **could see a clear bag in the ceiling tile from where I**

6    **was standing.  Reached up there, grabbed it, and it**

7    **contained the items.**

8        Q.   The ammunition?

9        A.   **Correct.**

10       Q.   And ammunition is used for a firearm; correct?

11       A.   **Correct.**

12       Q.   It's for a firearm?

13       A.   **Correct.**

14       Q.   And are there different types of ammunition?

15   You said there was 9 millimeter and a .38 caliber?

16       A.   **Yes.**

17       Q.   And that is two different kinds of ammunition?

18       A.   **Correct.**

19       Q.   In addition to executing a search warrant, did

20   you have an opportunity to interview the defendant that

21   day?

22       A.   **Briefly.**

23       Q.   Okay.  And I just want -- the only thing I want

88

1    to talk about is did the defendant identify which room

2    was his in the residence?

3        A.   **Yes.**

4        Q.   And which room did he identify as his during

5    your interview?

6        A.   **He didn't tell the room.  He said it was the**

7    **second-floor bedroom.  He said it had a padlock on it**

8    **because other people resided there, and that it was his**

9    **bedroom, the second floor.**

10       Q.   As part of your investigation, did you prepare

11   some or get together some photographs for Solimari

12   Torres and Marisol Ayala to view?

13       A.   **Yes.**

14       Q.   And what was the purpose of putting these

15   photographs together to ask them to look at them?

16       A.   **To try to identify a suspect.**

17       Q.   Before you prepared those photographs and put

18   them together, did they give you a general description

19   of what the person looked like?

20       A.   **Yes.**

21       Q.   And do you remember what that description was?

22       A.   **That he was possibly a Dominican male, about**

23   **five -- five-eight, and kind of pointed towards me and**

89

1  said my color skin, black hair, black short hair.

2  That's pretty much it.

3      Q.  And is there anything that you do in

4  determining what photographs to show to a witness?  Is

5  there anything that you do with the description that

6  they give you and the photographs that you showed them?

7      A.  Yes. What I try to do is I try to keep them

8  all consistent with the complexion, height, weight,

9  pretty much everything the same to give the person a

10  fair shot.

11     Q.  When you presented those photographs to Marisol

12  and to Solimari, did you tell them anything about the

13  photographs of who they were or anything like that?

14     A.  I had the six photos. I went to the house. I

15  took them in separate rooms. And I showed them the

16  photos, and I told them to look through the photos and

17  try to see if the person that came into their house was

18  in the photos; and if not, that it was okay; that it was

19  okay if he wasn't.

20     Q.  Detective Campos, I'm handing you what are

21  State's Exhibits 1 through 6. I'm just going to just

22  ask you to look at those photographs and tell the jury

23  whether those are the photographs that you showed to

90

1  Solimari Torres and to Marisol Ayala.

2      A.  Yes, they are.

3      Q.  And did Marisol Ayala or Solimari Torres

4  identify or point out any of those photographs to you as

5  a person that --

6      A.  Yes, they did.

7      Q.  And which photograph did they --

8      A.  No. 3.

9      Q.  Was that both of them or did one of them --

10     A.  That was both of them.

11     Q.  Can you describe to this jury -- I guess we can

12  take Solimari Torres first -- how she identified it?

13  Was it quickly? Did it take a long time? What did she

14  say when she identified that photograph?

15     A.  She looked through the photographs and she

16  pointed to No. 3 and said, He's the guy that came into

17  my house.

18     Q.  And how long did it take her to identify that

19  photograph?

20     A.  Seconds.

21     Q.  And how about with Marisol Ayala, did she look

22  at all six photographs?

23     A.  Yes, she did.

91

1      Q.  And she pointed to No. 3?

2      A.  Yes, she did.

3      Q.  And how quickly did she do that?

4      A.  Just about at the same time as Solimari Torres.

5      Q.  What did she say?

6      A.  She said that that was the gentleman that came

7  to her house, the guy that came into her house.

8      Q.  When you spoke to Marisol Ayala, did you speak

9  to her in Spanish or did you speak to her in English?

10     A.  I spoke to her in Spanish.

11     Q.  So you're sure -- so that you knew she

12  understood you and you understood her?

13     A.  She felt more comfortable in Spanish.

14     Q.  And can you tell the jury, looking at

15  photograph No. 3, whose name is on the back?

16     A.  Name is Christian DeJesus.

17     Q.  And that photograph, does that photograph

18  accurately depict the defendant seated in the courtroom?

19     A.  Yes.

20     Q.  In addition to speaking with Marisol Ayala

21  during your investigation, did you have an opportunity

22  to recently speak with her?

23     A.  Yes.

92

1      Q.  And did she -- can you tell the jury how she

2  seemed or she acted when you spoke to her about coming

3  to court and testifying.

4          MR. WILKINSON: Objection. Appears to be

5  asking for speculation on the detective guessing on how

6  she felt.

7          MS. WOLOSHIN: I can ask it --

8          THE COURT: Maybe it was over the telephone.

9          MS. WOLOSHIN: I think he can explain that if I

10  could ask him more questions leading up to this.

11         THE COURT: I'm a little bit uncertain about

12  just how this witness can form an opinion based on a

13  telephone conversation. Why don't you ask him some

14  questions to develop it.

15         MS. WOLOSHIN: Thank you.

16  BY MS. WOLOSHIN:

17     Q.  You actually spoke to her over the telephone;

18  is that correct?

19     A.  That's correct.

20     Q.  How long ago was that compared to today?

21     A.  About two weeks ago.

22     Q.  Other than on the telephone, have you had any

23  other conversations with her?

93

1    A.    Other than on the telephone?

2    Q.    Yes.

3    A.    Recently?

     Q.    Yes. Did you see her on Tuesday?

5    A.    Yes, I did, on Tuesday.

6    Q.    Did you speak with her on Tuesday?

7    A.    Yes.

8    Q.    And did you speak with her in Spanish?

9    A.    Yes.

10   Q.    On Tuesday?

11   A.    Correct.

12   Q.    And how about today?

13   A.    Today, no.

14   Q.    You didn't speak with her today?

15   A.    No.

16   Q.    On Tuesday, when you spoke to her, you were

17   speaking to her face to face?

18   A.    Yes.

19   Q.    And how did she seem to you when you spoke to

20   her on Tuesday?

21   A.    She seemed scared.

22   Q.    Now, were there any physical things that she

     was doing while you were talking to her?

94

1    A.    Yes. She was crying.

2    Q.    And did she explain to you why she was crying?

3    A.    Yes.

4    Q.    And what did she say?

5          MR. WILKINSON: Objection. Hearsay.

6          THE COURT: Depends on what the answer is.

7    I'll have to hear you at sidebar.

8          (The following sidebar conference was held.)

9          THE COURT: Do you know what the answer is

10   going to be?

11         MS. WOLOSHIN: Yes. She's going to say she was

12   scared of him in coming to court and testifying against

13   him. She was afraid of him.

14         THE COURT: Did she say why?

15         MS. WOLOSHIN: She said --

16         THE COURT: Did she say she'd been threatened

17   by him?

18         MS. WOLOSHIN: No, she did not.

           THE COURT: Since her fear may be developed

20   from something in her own mind without any evidence of a

21   direct threat from the defendant, then that's

22   inadmissible.

23         MS. WOLOSHIN: Okay.

95

1          (The sidebar having concluded, examination

2    continued.)

3          MS. WOLOSHIN: Your Honor, if I could just have

4    one moment.

5          (Pause.)

6          MS. WOLOSHIN: I don't believe I have anything

7    further. Thank you.

8          THE COURT: Mr. Wilkinson.

9

10                 CROSS-EXAMINATION

11

12   BY MR. WILKINSON:

13   Q.    So, Detective Campos, you first spoke to

14   Marisol and Solimari, that was about four days after the

15   alleged incident, I mean after February 14th?

16   A.    Yeah, on the 20th.

17   Q.    Okay, the 20th. So it was about six days after

18   the alleged incident on February 14th?

19   A.    Correct, sir.

20   Q.    And that's when you did the photo line-up?

21   A.    No, not at that time.

22   Q.    What date did you actually do the photo

23   line-up?

96

1    A.    March 6th.

2    Q.    March 6th?

3    A.    March 6th.

4    Q.    So that was about three weeks, approaching a

5    month after February 14th?

6    A.    That's correct.

7    Q.    Okay. And you showed them a total of six

8    photographs; correct?

9    A.    That's correct.

10   Q.    And you testified a little bit earlier that you

11   told them that you remember saying to them -- one

12   second.

13         (Pause)

14   BY MR. WILKINSON:

15   Q.    You said something to the extent of you don't

16   have to pick one out; correct?

17   A.    Yes.

18   Q.    Or something to that extent?

19   A.    Um-hmm.

20   Q.    And you said that because you are aware that

21   many individuals feel compelled to pick somebody out of

22   a line-up; correct?

23   A.    In some cases, yes.

97

1    Q.    That's a concern that you have with everybody,

2    that they may feel compelled to pick the closest looking

3    person; correct?

      A.    **They may feel compelled to pick someone out.**

5    Q.    And part of that is a fear that you'll -- that

6    they'll pick out the closest looking person to

7    whoever --

8      A.    **No. The fear is that they might just pick**

9    **someone out just to pick them out.**

10    Q.    Okay. And so it's no concern of you that -- it

11    doesn't concern you that someone feels compelled for

12    whatever reason, whether to make you feel or they feel

13    they could pick someone out. Is that a concern that you

14    have when you do a photo line-up?

15    A.    **Yes.**

16    Q.    So would it also concern you that if an

17    individual feels compelled to pick somebody out, they

18    will look at the line-up and just pick out the person

19    that most closely resembles the true perpetrator?

20    A.    **That could happen, yes.**

21    Q.    And that is something you're concerned with;

22    correct?

      A.    **Yes.**

98

1    Q.    Okay. 'Cause your goal is to find the true

2    perpetrator; correct?

3    A.    **That's correct.**

4    Q.    And though this is a consideration that you're

5    scared that a witness might just pick out an individual

6    that looks closest to the real perpetrator, you still

7    only showed Solimari and Marisol a total of six

8    photographs; correct?

9    A.    **That's correct.**

10    Q.    And out of the six, a handful, I don't

11    remember, two or three, were African American

12    individuals; correct?

13    A.    **Two of them.**

14    Q.    Two of them. Okay. So they both had said that

15    it was an Hispanic individual that went into their house

16    on February 14th; correct?

17    A.    **That's correct.**

18    Q.    So basically you showed them only four pictures

of Hispanic individuals; correct?

20    A.    **That's correct.**

21    Q.    And out of the Hispanic individuals, they would

22    have a 25 percent chance of picking any one of the

23    Hispanic individuals; correct, even under a random -- if

99

1    it was a random?

2      A.    **Well, if you also think about it, they said**

3    **they've seen him before on several occasions.**

4    Q.    The fact is you have -- you only showed them

5    pictures of four Hispanic individuals, but you have

6    access to a lot more photographs of different Hispanic

7    individuals; correct?

8      A.    **At that point that's all I had.**

9    Q.    Okay. So the photographs in your department to

10    do a line-up, you only have photographs of --

11    photographs of four Hispanic individuals?

12    A.    **I myself at that time, I had four photographs**

13    **of Hispanic males that matched the defendant's**

14    **description. Now, does anyone else have some? They may**

15    **have them locked up somewhere. But at that time I only**

16    **have four Hispanic males that matched the description.**

17    Q.    The house where you did the search warrant

18    where Mr. DeJesus lived, there were other individuals

19    that lived in that house; correct?

20    A.    **Yes.**

21    Q.    And Mr. DeJesus told you that he rented a room

22    in that house and he shared it with other individuals?

23    A.    **That's correct.**

100

1    Q.    And when did you -- what was the date that you

2    did the search of the room?

3    A.    **March 6th.**

4    Q.    March 6th. Do you remember what time it was?

5    A.    **If I could refer to my report.**

6    Q.    Oh, yes. Go ahead.

7    A.    **About 9:35 p.m.**

8    Q.    9:35. And you don't really have any personal

9    knowledge who has access to a key to the padlock that

10    was on the door, do you?

11    A.    **No.**

12    Q.    And you don't know when the last time -- was

13    there anyone in the room when you went into the room?

14    A.    **No, sir.**

15    Q.    And you don't know when the last time anyone

16    was in that room?

17    A.    **No. I wouldn't have --**

18    Q.    You wouldn't have any idea; correct?

19    A.    **No.**

20    Q.    You wouldn't know who the last person in the

21    room could have been?

22    A.    **That's correct.**

23    Q.    And in terms of the bullets, you say they were

101

1  found in the ceiling --
2  A.  **Yes.**
3  Q.  -- the ceiling tiles?
4     You have no idea how long they were sitting
5  there, do you?
6  A.  **No.**
7  Q.  Going back to the alleged incident on
8  February 14th, you never retrieved a gun associated with
9  that alleged incident; is that correct?
10  A.  **That's correct.**
11  Q.  If there was an incident that occurred, you
12  would have no idea whether those bullets would even fit
13  that gun; correct?
14  A.  **That's correct.**  why you fuck that but he
15  Q.  And you spoke to Marisol in Spanish 'cause you
16  thought you would have a better communication with her
17  in Spanish?
18  A.  **She told me she felt better speaking to me in**
19  **Spanish.  She felt more comfortable.**
20  Q.  Okay.  And you wrote up an affidavit of
21  probable cause; correct --
22  A.  **Yes.**
23  Q.  -- in regard to this matter?

102

1     And you did refer in that affidavit to Grace as
2  Marisol's granddaughter; correct?
3  A.  **If I can take a look at it.**
4     MR. WILKINSON:  If I could approach the
5  witness?
6     THE COURT:  You may.
7  BY MR. WILKINSON:
8  Q.  Okay.  I went and underlined it.  It's the
9  first sentence on the top.
10  A.  **Yes.  Yes, I did.**
11  Q.  Okay.  And that was after you wrote that up
12  after you had your conversation with Marisol about this
13  incident?
14  A.  **Yes.**
15     MR. WILKINSON:  Could I retrieve that, please?
16     THE COURT:  Yes.
17     MR. WILKINSON:  If I could just have one
18  second, Your Honor.
19     (Pause.)
20     MR. WILKINSON:  No further questions at this
21  time.
22     THE COURT:  Ms. Woloshin.
23     MS. WOLOSHIN:  Thank you.

103

1
2              REDIRECT EXAMINATION
3
4  BY MS. WOLOSHIN:
5  Q.  You wrote a police report, supplement report;
6  correct?
7  A.  **Yes.**
8  Q.  Can you tell the jury how many pages that
9  report contains?
10  A.  **Ten pages.**
11  Q.  Anywhere in that report do you refer to Grace
12  Almodovar as Marisol Ayala's granddaughter?
13  A.  **No.**
14  Q.  Other than the ammunition that you found in the
15  defendant's room, ammunition for a gun, did you find any
16  documents?
17  A.  **Yes.**
18  Q.  And what kind of documents did you find?
19  A.  **A receipt.**
20  Q.  What kind of a receipt?
21  A.  **A Pep Boys receipt.**
22  Q.  That was found in the defendant's room?
23  A.  **That's correct.**

104

1     (Pause.)
2     MR. WILKINSON:  Without objection.
3     MS. WOLOSHIN:  Your Honor, without objection,
4  the State moves into evidence the receipt.
5     THE COURT:  That will be State's Exhibit 11.
6     THE CLERK:  So marked, Your Honor.
7     (State's Exhibit No. 11 was admitted into
8  evidence.)
9     MS. WOLOSHIN:  May I approach the witness, Your
10  Honor?
11     THE COURT:  Yes.
12     MS. WOLOSHIN:  Thank you.
13  BY MS. WOLOSHIN:
14  Q.  Detective Campos, I'm handing you what is
15  State's Exhibit 11.  Is that the Pep Boys receipt that
16  you recovered during the search warrant of the
17  defendant's room?
18  A.  **Yes, it is.**
19  Q.  Okay.  Can you tell me whether the defendant's
20  name is anywhere on that receipt.
21  A.  **Yes, it is.  It's on there.**
22  Q.  And it says "Christian DeJesus"?
23  A.  **Yes.**

105

1    Q.    And Pep Boys is an automotive store; correct?

2    A.    **Correct.**

3    Q.    I'm stating the obvious.

Is there a certain vehicle that is listed on

that receipt?

6    A.    **Yes.**

7    Q.    And what vehicle is that?

8    A.    **It's a Chrysler New Yorker, 1996, Pennsylvania**

9    **tag ELT 7400.**

10    Q.    And that's the same car that you found the

11    defendant driving in; is that correct?

12    A.    **That's correct.**

13    Q.    Can you tell the jury what the date of that

14    receipt is.

15    A.    **11/27/2002.**    *2 months.*

16    Q.    So months before the actual incident; correct?

17    A.    **That's correct.**

18    Q.    And can you tell the jury what address is

19    listed for Christian DeJesus?

20    A.    **1702 West Third Street, Wilmington, Delaware**

21    **19805.**

22    Q.    And March 6th, 2003, what address did you

23    execute a search warrant on?

---

106

1    A.    **1702 West Third Street, Wilmington, Delaware**

2    **19805.**

3    Q.    The same address; is that correct?

4    A.    **That's correct.**

5    Q.    When you interviewed the defendant, did he tell

6    you why he had a padlock on his room door?

7    A.    **Because other people reside in the residence.**

8    Q.    And so what was the purpose of putting the

9    padlock on there?

10    A.    **To keep people out of his room.**

11    MS. WOLOSHIN:  Thank you.  I have nothing

12    further.

13    THE COURT:  How far is 1702 West Third Street

14    from the place where this incident took place?

15    THE WITNESS:  Two and a half blocks, Your

16    Honor.

17    THE COURT:  Two and a half blocks?

18    THE WITNESS:  Yes, sir.

THE COURT:  Anything else?

MS. WOLOSHIN:  No, Your Honor.

21    MR. WILKINSON:  Yes.

22

23    RECROSS-EXAMINATION

---

107

1

2    BY MR. WILKINSON:

3    Q.    The Pep Boys receipt, that wasn't found where

4    the bullets were.  The Pep Boys receipt was not found in

5    the ceiling, was it?

6    A.    **That's correct.**

7    Q.    It was found in a dresser drawer?

8    A.    **Yes.**

9    MR. WILKINSON:  No further questions.

10    THE COURT:  Ms. Woloshin?

11    MS. WOLOSHIN:  Nothing further, Your Honor.

12    THE COURT:  Okay.  Officer, you may now step

13    down.

14    (Pause.)

15    THE COURT:  I'm about to call it a day.  Do you

16    have any other witnesses to present for tomorrow?

17    MS. WOLOSHIN:  I don't believe so.  I just have

18    to check with one witness, possibly Officer Medve, but I

19    don't anticipate calling anybody else.  But there's a

20    possibility.

21    THE COURT:  Mr. Wilkinson, are you anticipating

22    calling any witnesses tomorrow?

23    MR. WILKINSON:  No, Your Honor.

---

108

1    THE COURT:  You're not sure yet?

2    MR. WILKINSON:  Correct.

3    THE COURT:  I understand.  The reason I'm

4    asking, if there are witnesses, I might convene a little

5    earlier.  It sounds to me there probably won't.  And

6    counsel and the Court still to have prepare the

7    instructions of law you folks have to get tomorrow.

8    I'm going to ask you to come in at 10:30.  Even

9    if there is some testimony, that will allow us ample

10    time to get the case into your hands by tomorrow

11    afternoon.

12    During this overnight recess, please bear in

13    mind the instructions about not discussing the case

14    among yourselves or with anyone outside the courtroom.

15    I will ask you to come in at 10:30 tomorrow morning.

16    Have a good evening.  And the jury is excused.

17    (The jury left the courtroom at 4:32 p.m.)

18    THE COURT:  Anything we need to talk about?

19    MS. WOLOSHIN:  No, Your Honor.

20    MR. WILKINSON:  Just so we're clear, I don't

21    plan on calling any other witnesses.  Mr. DeJesus may

22    testify or may not.  I would still --

23    THE COURT:  I fully understood that.  And

---

109

1  you're entitled to have overnight to discuss that with

2  him.

3         If Mr. DeJesus testifies, are there any

   previous criminal convictions?  The reason I ask is that

5  I'll include the proper instruction in the --

6         MR. WILKINSON:  No, there are no criminal --

7  like a speeding ticket, I believe.

8         THE COURT:  Okay.  Are there any requests for

9  lesser includes?  I'm not sure that there are any here

10 yet.

11        MR. WILKINSON:  Your Honor, none are coming to

12 mind right now, but I don't want to give a definitive

13 no.

14        THE COURT:  I'm not asking you to be definitive

15 about it.  I'll take a look at it myself, and if I don't

16 think there's any, I'll be prepared.  And if you tell me

17 about them tomorrow, I'll make sure they get in there.

18        MR. WILKINSON:  Thank you.

19        THE COURT:  Court's in recess.

20        (Whereupon the proceedings concluded at 4:35

21 p.m.)

22

23

110

STATE OF DELAWARE:

NEW CASTLE COUNTY:

        I, Domenic M. Verechia, Official Court Reporter

of the Superior Court, State of Delaware, do hereby

certify that the foregoing is an accurate transcript of

the proceedings had, as reported by me in the Superior

Court of the State of Delaware, in and for New Castle

County, in the case therein stated, as the same remains

of record in the Office of the Prothonotary at

Wilmington, Delaware, and that I am neither counsel nor

kin to any party or participant in said action nor

interested in the outcome thereof.

        WITNESS my hand this 25th day of June, 2004.

        _____
        Domenic M. Verechia, RPR
        Certification No. 162-PS

**ORIGINAL**

0 6 ⸺ 5 5 3

IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTIAN DEJESUS,                    )
                                      )
    Defendant Below,                  )
    Appellant,                        )
                                      )    No. _____, 2004
v.                                    )
                                      )
STATE OF DELAWARE,                    )            0 6 ⸺ 5 5 3
                                      )
    Plaintiff Below,                  )
    Appellee.                         )            ┌─────────────────────────┐
                                                   │        **FILED**         │
                  NOTICE OF APPEAL                 │      SEP 0 6 2006        │
                                                   │                         │
TO:  LOREN MEYERS, ESQUIRE                         │   U.S. DISTRICT COURT    │
     Deputy Attorney General                      │  DISTRICT OF DELAWARE    │
     Department of Justice                         └─────────────────────────┘
     State Office Building
     820 North French Street
     Wilmington, DE 19801

    PLEASE TAKE NOTICE that Christian DeJesus, defendant-

below, appellant, does hereby appeal to the Supreme Court of

the State of Delaware, from the convictions and sentence

imposed on May 14, 2004, in the Superior Court of the State of

Delaware by the Honorable John E. Babiarz, Jr., in Criminal

Action Nos. IN03031089-95 and IN03040614-15 in that Court.

The name and address of the attorney below for Appellee is:

Loren Meyers, Deputy Attorney General, Department of Justice,

State Office Building, 820 North French Street, Wilmington,

Delaware.  The party against whom the appeal is taken is the

State of Delaware.

*Exhibit G*

A copy of the order being appealed from is not available but has been requested and will be filed with a cover letter as soon as same is received from the Prothonotary.

PLEASE TAKE FURTHER NOTICE that appellant hereby designates the portions of the record and transcript in accordance with Rule 7(c)(6) and 9(e)(ii) in the following manner:

Designation set forth on attached Exhibit A.

Dated:  May 19, 2004

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
State Office Building
820 North French Street
Wilmington, DE 19801

DIRECTIONS TO COURT REPORTER TO PROCEEDINGS
BELOW TO BE TRANSCRIBED PURSUANT TO RULE 9 (e)

TO:  Domenic Verechia
     Court Reporter, Superior Court
     New Castle County Courthouse
     500 N. King Street
     Wilmington, DE 19801

Appellant does hereby direct the proceedings in Christian DeJesus v. State of Delaware, Criminal Action Nos. IN03031089-95 and IN03040614-15 in the Superior Court of the State of Delaware, In and For New Castle County, to be transcribed to include the following:

1.   Opening statements of the State and the defendant;

2.   All trial testimony including sidebars and office conferences during the trial;

3.   Closing arguments of the State and the defendant; and,

4.   The Court's instructions to the jury and any exceptions thereto.

I hereby certify that transcription of the above-listed portions of the proceedings below is essential to the prosecution of this appeal.

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
Carvel State Office Building
820 N. French Street
Wilmington, Delaware 19801

## AFFIDAVIT OF MAILING

BE IT REMEMBERED that on this 19th day of May, 2004, personally appeared before me, a Notary Public for the State and County aforesaid, Marjorie L. Swain, a secretary for the Public Defender's Office, who being by me duly sworn did depose and say as follows:

1. That she caused to be delivered by Public Defender runner, two copies of Appellant's Notice of Appeal, and two copies of Directions to Court Reporter to Proceedings Below to be Transcribed Pursuant to Rule 9(e) in the above-captioned matter to Loren Meyers, Deputy Attorney General, Department of Justice, State Office Building, 820 North French Street, Wilmington, Delaware 19801; and,

2. That she caused to be delivered by Public Defender runner, two copies of Directions to Court Reporter to Proceedings Below to be Transcribed Pursuant to Rule 9(e) in the above-captioned matter to Domenic Verechia, Court Reporter, Superior Court, New Castle County Courthouse, 500 N. King Street, Wilmington, Delaware 19801.

Marjorie L. Swain

SWORN TO AND SUBSCRIBED by me the day and year aforesaid.

NOTARY PUBLIC/ATTORNEY AT LAW

ORIGINAL

0 6 ‒ 5 5 3 ‒

IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTIAN DEJESUS,                    )
                                      )
        Defendant Below,              )
        Appellant,                    )
                                      )    No. _____, 2004
v.                                    )
                                      )
STATE OF DELAWARE,                    )        0 6 ‒ 5 5 3 ‒
                                      )
        Plaintiff Below,              )
        Appellee.                     )

```
┌─────────────────────────┐
│        FILED            │
│                         │
│     SEP 0 6 2006        │
│                         │
│  U.S. DISTRICT COURT    │
│  DISTRICT OF DELAWARE   │
└─────────────────────────┘
```

NOTICE OF APPEAL

TO:  LOREN MEYERS, ESQUIRE
     Deputy Attorney General
     Department of Justice
     State Office Building
     820 North French Street
     Wilmington, DE 19801

     PLEASE TAKE NOTICE that Christian DeJesus, defendant-

below, appellant, does hereby appeal to the Supreme Court of

the State of Delaware, from the convictions and sentence

imposed on May 14, 2004, in the Superior Court of the State of

Delaware by the Honorable John E. Babiarz, Jr., in Criminal

Action Nos. IN03031089-95 and IN03040614-15 in that Court.

The name and address of the attorney below for Appellee is:

Loren Meyers, Deputy Attorney General, Department of Justice,

State Office Building, 820 North French Street, Wilmington,

Delaware.  The party against whom the appeal is taken is the

State of Delaware.

*Exhibit G*

A copy of the order being appealed from is not available but has been requested and will be filed with a cover letter as soon as same is received from the Prothonotary.

PLEASE TAKE FURTHER NOTICE that appellant hereby designates the portions of the record and transcript in accordance with Rule 7(c)(6) and 9(e)(ii) in the following manner:

Designation set forth on attached Exhibit A.

Dated:  May 19, 2004

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
State Office Building
820 North French Street
Wilmington, DE 19801

DIRECTIONS TO COURT REPORTER TO PROCEEDINGS
BELOW TO BE TRANSCRIBED PURSUANT TO RULE 9 (e)

TO:  Domenic Verechia
     Court Reporter, Superior Court
     New Castle County Courthouse
     500 N. King Street
     Wilmington, DE 19801

Appellant does hereby direct the proceedings in Christian
DeJesus v. State of Delaware, Criminal Action Nos. IN03031089-
95 and IN03040614-15 in the Superior Court of the State of
Delaware, In and For New Castle County, to be transcribed to
include the following:

1.    Opening statements of the State and the defendant;

2.    All trial testimony including sidebars and office
conferences during the trial;

3.    Closing arguments of the State and the defendant;
and,

4.    The Court's instructions to the jury and any
exceptions thereto.

I hereby certify that transcription of the above-listed
portions of the proceedings below is essential to the
prosecution of this appeal.

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
Carvel State Office Building
820 N. French Street
Wilmington, Delaware 19801

## AFFIDAVIT OF MAILING

BE IT REMEMBERED that on this 19th day of May, 2004, personally appeared before me, a Notary Public for the State and County aforesaid, Marjorie L. Swain, a secretary for the Public Defender's Office, who being by me duly sworn did depose and say as follows:

1.    That she caused to be delivered by Public Defender runner, two copies of Appellant's Notice of Appeal, and two copies of Directions to Court Reporter to Proceedings Below to be Transcribed Pursuant to Rule 9(e) in the above-captioned matter to Loren Meyers, Deputy Attorney General, Department of Justice, State Office Building, 820 North French Street, Wilmington, Delaware 19801; and,

2.    That she caused to be delivered by Public Defender runner, two copies of Directions to Court Reporter to Proceedings Below to be Transcribed Pursuant to Rule 9(e) in the above-captioned matter to Domenic Verechia, Court Reporter, Superior Court, New Castle County Courthouse, 500 N. King Street, Wilmington, Delaware 19801.

Marjorie L. Swain

SWORN TO AND SUBSCRIBED by me the day and year aforesaid.

NOTARY PUBLIC/ATTORNEY AT LAW

**ORIGINAL**

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| CHRISTIAN DEJESUS, | ) |
| | ) |
| Defendant Below, | ) |
| Appellant, | ) |
| | ) |
| v. | ) No. 213, 2004 |
| | ) |
| STATE OF DELAWARE, | ) |
| | ) |
| Plaintiff Below, | ) |
| Appellee. | ) |

---

ON APPEAL FROM THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

---

APPELLANT'S BRIEF UNDER RULE 26(C)



FILED

SEP 0 6 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
Carvel State Office Building
820 N. French Street
Wilmington, Delaware 19801
Attorney for Appellant

DATED: September 24, 2004

*Exhibit- G1*

TABLE OF CONTENTS

Page

STATEMENT OF CHARGES . . . . . . . . . . . . . . . . . 1

NATURE OF DEFENSE AT TRIAL . . . . . . . . . . . . . . 2

SUMMARY OF THE EVIDENCE . . . . . . . . . . . . . . . 3

SIGNIFICANT APPLICATIONS AND RULINGS . . . . . . . . . 6

SENTENCE . . . . . . . . . . . . . . . . . . . . . . . 7

POINTS THE APPELLANT WISHES THE COURT TO CONSIDER . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 9

SENTENCE ORDER . . . . . . . . . . . . . . . . . . . .10

i

## STATEMENT OF CHARGES

On April 7, 2003  Defendant was indicted by the Grand Jury of New Castle County for Burglary First Degree, 3 counts of Aggravated Menacing, 4 counts of Possession of a Firearm During the Commission of a Felony, and Unlawful Imprisonment First Degree for an alleged incident involving Marisol Ayala, Grace Almodovar and Solimari Torres on February 14, 2003.

1

## NATURE OF DEFENSE AT TRIAL

Defendant testified that he did not commit any of the acts alleged by the State.  Defendant introduced two letters written by one of the victims that stated Defendant had not committed the alleged offenses.

## SUMMARY OF THE EVIDENCE

The State called four witnesses for a trial that commenced on May 13, 2004 and ended on May 14, 2004.

Grace Almodovar was the first witness to testify on the state's behalf. Almodovar was six years old at the time she testified at trial. Almodovar testified that a man came to her house and put a gun to her face and scared her. She further testified that she was in the house with her mother and sister. Almodovar never identified the Defendant. (A11)

Marisol Ayala was the next state's witness to testify. She stated that at the time of the alleged incident she lived with her two daughters, Grace Almodovar and Solimari Torres. Ayala testified that she was sitting outside of her apartment smoking when an individual approached her with a gun. Ayala stated that the individual "put the gun on me" and wanted to go into her house to look for someone else. Ayala testified that the individual with the gun was very angry and drove up to the house in a big green car. Ayala stated that the individual forced himself inside of the house, grabbed Almodovar and held the gun to her head. Ayala further stated that Solimari Torres was in the room and fainted upon seeing the individual with the gun. (A12-14)

Ayala also stated that a mugshot of the Defendant looked like the individual who committed the alleged offenses. She

3

stated that she picked out the Defendant's picture as looking similar to the perpetrator when she was shown it months before by Detective Campos. (A14-15)

Ayala under cross examination stated she could not be absolutely sure that it was the Defendant who committed the alleged crimes. Furthermore, she admitted to preparing two letters stating that the Defendant had not committed the alleged acts. (A16-17)

Solimari Torres was the next state's witness to testify. She stated that she is seventeen years old and the daughter of Marisol Ayala and sister of Grace Almodovar. Torres testified that a man forced his way into the apartment in which she lived brandishing a handgun. Torres testified that the individual with the handgun later got into a car and drove away. She stated that she picked the Defendant out of a picture lineup after the incident.      Torres further testified that she spoke to the Defendant about the alleged incident after the fact and that he apologized to her and said he felt bad about what he had done. (A18-21)

Detective Campos was the next witness to testify. Campos stated that he spoke to the prior three witnesses about the alleged incident. (77-84) He further stated that he executed a search warrant on the Defendant's bedroom and found several different types of ammunition for a handgun. (83) Campos

4

testified that Ayala and Torres had picked the Defendant out of a six photograph lineup. (A24)

The Defendant testified at trial. He stated that he did not commit the alleged offenses. He stated that he shared his rented room with his brother.   The Defendant admitted to speaking to Solimari Torres after the alleged incident but stated that he never told Torres that he had committed the acts.   (A27-31)   Defense rested after the testimony of Defendant.

Defendant was convicted on all counts.

5

## SIGNIFICANT APPLICATIONS AND RULINGS

At the start of the trial Mr. Dejesus directly addressed the court and asked for leave to get a different attorney and to have the assistance of an interpreter. The trial judge denied the Defendant's request for another lawyer and held that he had sufficient command of the English language to proceed to trial. (A25-26)

At the end of the State's case, the Defendant asked for a Judgment of Acquittal regarding the Unlawful Imprisonment Charge and argued any restraint would be incidental to the act of Aggravated Menacing. The trial judge denied Defendant's motion on grounds that the two offenses were distinguishable. (A25)

Just prior to sentencing, the Defendant asked for merger of the Aggravated Menacing and Unlawful Imprisonment charges as well as the accompanying Possession of a Deadly Weapon Charge accompanying each offense. The trial judge denied the Defendant's motion. (A32)

There were no other legally significant applications or rulings.

6

## SENTENCE

As to the four counts of Possession of a Firearm During the Commission of a Felony, IN03-03-1089, IN03-03-1090, IN03-03-1091, and IN03-04-0614, Defendant was sentenced to 3 years Level 5 for each count. Therefore, Defendant was sentenced to a total of 12 years level 5.

As to the count of Burglary 1st Degree, IN03-03-1092 Defendant was sentenced to 18 months Level 5 suspended for 18 months at Level 3 probation.

As to the count of Unlawful Imprisonment 1st Degree, IN03-03-1615 Defendant was sentenced to 18 months Level 5 suspended for 18 months at Level 3 probation.

As to the three counts of Aggravated Menacing, IN03-03-1093, IN03-03-1094, and IN03-03-1095, Defendant was sentenced to 18 months Level 5 suspended for level 3 probation for each count.

7

## POINTS THE DEFENDANT WISHES THE COURT TO CONSIDER

Please see Attachment.

8

0303004601

(42)

Mr. Rcle D. Wilkinson      Date 9-9-2005

From: Gistian De Jesus

Re: Points the Defendant wishes the court to consider

Mr. Wilkinson

After recieving and reviewing the transcripts from my case I have discovered some inconsistencies and or conflicts with the statements made by the witnesses. Also the fact that I asked for but never recieved a translator so I could fully understand what was happening during my trial.

Ms Ayala and Ms Torres gave two different accounts of what happened and who left the house when. In section 62 ms torres stated that she passed out. then in section 63 ms torres then stated that she did not pass out. Also in section 63 ms torres stated that she ran out the house. In section 64 ms torres stated that she left the house before the man with the gun. In Section 41 Ms Ayala stated that ms torres fell down. that right after he left the house she went to ms torres and woke her up.

page 9

If Ms Ayala's statement is true how could Ms. Torres possibly describe the car the man with the gun got into. Ms Torces has seen the Defendent prior to the incident.

If Ms Ayala told Ms. Torre that it was Mr. Degesus who done this of course Ms Torres Could describe his car.

In Section 71 Ms Torres that she heard some gun shots from where she was calling the police.

In section 41 Ms Ayala stated that she herself called the police immediatly.

Was it Ms Ayala or Ms. Torres who called the police because they both claim to have made the call

The next point that I would like concidered is the letters written by Ms. Ayala. Ms Ayala wrote two letters, one to Mr Degesus, the other in behave of Mr Degesus that she had notarized. Both letters stating that Ms. Ayala made mistake that Mr. Degesus was not the man who entered her house.

Ms Ayala was told that if she did not testify that she would be locked up.

Page 10

Ms. Ayala did in fact spend a night in jail

This incident occured on or about
Feb. 14 2003. Det Compos did not show the
victums the picture line-up until march 6, 2003.
In Section 43 Ms. Ayala stated that of all the
pictures she had been shown all the men were
black exept one.
In Section 44 Ms. Ayala stated that she couldnt
exactly say thats him that it looks like him.
Ms. Ayala never made a positive I.D. so out
of 6 pictures all the men were black or at
lesst dark complectioned exept the picture of
the defendant.

Ms. Torres was shown the same 6
pictures as Ms. Ayala. Ms. Torres walks down
3rd street often and has seen the defendant
several times. Ms. Torres even knows the
defendant name. She was shown 6 pictures.
5 of which were unknown and of dark
complexion.
1 being the defendant who is know by Ms.
Torres and of light complexion.
The description of the man with the gun was

Page 11

to be the same skin tone as Det. Campos light. the defendant the only light skin man in the line-up stuck right out if it was or wasnt him.

these are the fact I would like the court to conclder Could you please add these to anything you wish to present to the court in my behave Could you also foward me a copy of everything you plen to present to the Court

Sincerely, Cristion Degesus
501798

C: De jesus
C: Rolf D. wilkinson

Page 12

CONCLUSION

Wherefore, a judgement of this Court is sought upon the basis of the facts and authorities recited herein.

Respectfully submitted,

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender

Dated:   September 24, 2004

9

IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTIAN DEJESUS,                  )
                                    )
        Defendant Below,            )
        Appellant,                  )
                                    )
v.                                  )        No. 213, 2004
                                    )
STATE OF DELAWARE                   )
                                    )
        Plaintiff Below,            )
        Appellee.                   )

## MOTION TO WITHDRAW AS COUNSEL

Ralph David Wilkinson, IV, attorney for Appellant, hereby

moves pursuant to Supreme Court Rule 26(c) that this Honorable

Court grant him leave to withdraw as counsel. Counsel states

that he has made a conscientious examination of the record and

the law and concludes that an appeal is wholly without merit.

WHEREFORE, counsel requests that the Court allow him to

withdraw.

RALPH D. WILKINSON, IV, ESQUIRE
Assistant Public Defender
820 North French Street
Wilmington, DE 19801

Dated: September 24, 2004

## ORDER

SO ORDERED this _____ day of _____, 2004.

_____
JUSTICE

process was violated under the "totality of circumstances" because the victim was threaten by the prosecutor of being put in jail if she did not testify against the petitioner, the threat was carried out, the victim was put in jail overnight. See also *Foster V. California*, 394 U.S. 440, 443-44 (1969). In *Neil V. Biggers*, 409 U.S. 188, 198 (1972). The Court noted that "it is the likelihood of misidentification which violates a defendant's right to due process" and thus the court focused its inquiry on the reliability of the identification testimony. The reliability of the identification testimony weighs heavily in petitioner's favor. (Please see attached transcript of trial pages 50 thru 55.)

In *Manson V. Brathwaite*, 432 U.S. 98, 114 (1977). Accordingly, an identification derived from unnecessarily suggestive procedures need not be excluded if the totality of the circumstances indicates that the identification is reliable. In petitioner's case, the identification was unreliable and and coerced. (See trial transcript at pages 49 and 55). (See also trial transcript page 25, lines 15 thru 23 and page 26, lines 1 thru 14). Counsel should have filed Motion To Dismiss prior to trial, based upon misidentification stated by the victim in certified letter. Had Counsel filed such motion the probability exist that the charges would have been dismissed.

(3)

FILED

NOV 17 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Scanned

1/M Cristian De Jesus
SBI# 501296 UNIT W1
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

WILMINGTON DE 197
16 NOV 2006PM 1 T

U.S.MS.
X-RAY

Office of the clerk
United states District
Court 844 n. King St.
Lockbox 18 wilmington
DE. 19801-3570

Legal mail